In the Matter of Arbitration Between Pension Plan Trustees Designated by the:

# INTERNATIONAL LONGSHOREMEN'S ASSOCIATION

-and-

# BOSTON SHIPPING ASSOCIATION

CASE NAME: **Paul Bard, Eligibility to Apply for a Disability Pension**

## AWARD OF THE ARBITRATOR

The UNDERSIGNED ARBITRATOR(S), having been designated in accordance with the arbitration agreement entered into by the above-named Parties, and dated and having been duly sworn and having duly heard the proofs and allegations of the Parties, AWARDS as follows:

Paul Bard is eligible to apply for a disability pension.

Date:   March 4, 2005

Philip Dunn, Arbitrator

<u>In the Matter of Paul Bard's Eligibility to Apply for Disability Pension</u>          Page 2

Appearances:    ANGOFF, GOLDMAN, MANNING, WANGER & HYNES, P.C., by E. David Wanger, Esq., Counsel for International Longshoremen's Association

MORGAN, BROWN & JOY, LLP, by Philip G. Boyle, Esq. and James M. Pender, Esq., Counsel for the Management Trustees of the BSA/ILA Pension Plan

## STIPULATED ISSUE

Whether or not Paul Bard is eligible to apply for a disability pension?

## RELEVANT PROVISIONS of the BSA/ILS PENSION PLAN

ARTICLE III – DEFINITIONS ....

**3.12** "Employee" shall mean (a) each individual who now, or hereafter is employed as a Longshoreman, Clerk, or Linehandler in the industry and is a member of the ILA and for who an Employer is required to make contributions to the Trust Fund....

**3.22** "Participant" shall mean an Employee who has met the requirements of eligibility to participate in the Plan....

ARTICLE VIII – DISABILITY BENEFITS

**8.1** In the event that a Participant who has completed fifteen (15) years of service becomes totally and permanently disabled, such Participant shall be entitled to a disability benefit which shall commence on the first day of the month following the Board's determination that the Participant is disabled. The monthly amount of the disability benefit shall be equal to the Participant's Accrued Benefit. The Board, upon competent medical evidence, shall be the sole judge of whether a Participant is disabled....

<u>**In the Matter of Paul Bard's Eligibility to Apply for Disability Pension**</u>     <u>**Page 3**</u>

## SUMMARY OF RELEVANT FACTS

Prior to his termination on July 23, 2001, Paul Bard had worked for about 30 years as a crane operator covered by the BSA/ILA collective bargaining agreement. Except for serious problems relating to substance abuse, which are summarized below, Bard's employment record does not reflect any problems with poor or unsatisfactory work performance. He worked full time through his final day of employment, July 22, 2001.

Looking back at his history of substance abuse, Bard failed a drug and alcohol test in October 1998, and received a sixty day suspension pursuant to the Drug and Alcohol Abuse Program. In July 1999, Bard was selected at random to undergo another drug and alcohol test. He failed to appear for that test as directed. For that second offense, his employment under the BSA/ILA labor contract was terminated. However, as stated in the July 29, 1999 letter of termination,

> The Management-ILA Program for Drug and Alcohol Abuse provides that you will be eligible for final reinstatement in the industry provided that you follow the steps in Article 9 Paragraph A ... attached....

Bard apparently availed himself of this opportunity to seek required treatment, as part of his effort to meet the requirements for "final reinstatement in the industry." A letter dated from February 5, 2004 from Linda Lawless, MA, LMHC, LMFT, contains the following information in that regard:

> Mr. Bard was referred (in 2000) by his ... EAP, ComPsych. I saw him on the following dates and entered clinical notes for each session as follows:
>
> 3-7-2000 – ... Says he is drug free and only wants to get back to work. Spoke quickly, tapping foot, noted his rapidity and queried re cocaine use. He said he was currently drug free and that he had been agitated like that all his life. Reports he has little patience with waiting for anything.... He has a history of drug use, substance abuse, and gambling. Dx, Rule Out Anxiety Disorder, Impulse Disorder, Substance Abuse (Dual Diagnosis) and/or some form of Mood Disorder.

**In the Matter of Paul Bard's Eligibility to Apply for Disability Pension          Page 4**

>       3-14-2000 – Presented agitated. Asked why and he stated that his wife and father had heart attacks this week.... He says he is trying to get back to work but reports that no one answers his calls, very frustrated and anxious. Revealed through conversation that he is not sleeping... Rx ... see physician. Explored lifestyle habits. He appears to have some compulsive problems with behaviors and is aware at the time he is doing them that they are odd. RO Obsessive Compulsive Disorder.
>
>       3-21-2000 – Final EAP authorized session. Continues to demonstrate anxiety with emotional overtones in session. Rx pursuing individual psychotherapy and other community support programs. Exit diagnosis still unclear. Rx gathering more data to explore psychopharm intervention.

      Effective July 29, 2000, Bard was cleared to return to work in the industry, as an employee covered by the BSA/ILA collective bargaining agreement. Before being so cleared, he on July 12, 2000 had signed a "Post-Rehabilitation Testing Consent Form" which stated in part,

>       I ... hereby agree as follows:
>       1) I hereby consent to be (drug) tested at any time ... during a period of eighteen months after the date that I return to work; and
>       2) That if any such test shows a "positive" result, then that alone will be grounds for (a) my being immediately discharged by my employer and (b) for my being permanently barred from referral for industry employment under the BSA-ILA collective bargaining agreements....

      Bard thus returned to work as a crane operator under the BSA/ILA labor agreement on July 29, 2000.

      On July 16, 2001, Bard was operating MGM #5 when it was involved in a collision with a truck. Bard was subjected to a drug and alcohol screen, and tested positive. Thus, by letter dated July 23, 2001, Bard was "discharged and permanently terminated from the industry." Neither Bard nor the ILA filed a grievance contesting his discharge.

      Sometime in or after July 2003, Bard wrote the following letter to the trustees of the BSA/ILA pension plan:

**In the Matter of Paul Bard's Eligibility to Apply for Disability Pension          Page 5**

> In July 2001 I was terminated from my position as a crane operator.... I have since been diagnosed with Manic Depression, which the doctor felt was a chronic on going problem for many years.... I would now like to apply for my (disability) pension because: I am unable to function rationally and competently....

The trustees initially concluded that Bard was not eligible in 2003 to apply for a disability pension, on the basis that an individual who had been terminated from employment would not be eligible to apply.

Mr. Bard apparently asked for reconsideration of that determination. By letter dated and faxed on December 30, 2003, the trustees sought an opinion from counsel regarding Bard's eligibility to apply for a disability pension.

On December 31, 2003, Attorney Appugliese gave the following, written opinion to the trustees.

> The controlling plan provision is Section 8.1. In 8.1, the plan states that a Participant must have 15 years of service and become totally disabled. Participant is defined as an employee who has met the eligibility requirements of the Plan.
>
> I think it safe to say that Mr. Bard is eligible for a disability pension IF the Trustees determine that he was totally and permanently disabled – a question that they have apparently not yet reviewed. I believe Mr. Bard would be eligible because (assuming his substance abuse is considered a disability) he was disabled while still employed. I read your letter to indicate that he was terminated for violation of a drug policy in place, and therefore, I would have to assume that he was employed while utilizing some drug or alcohol and his termination was in response to that use. Therefore, if his use is deemed a disability, he was disabled while employed.
>
> This scenario is distinguishable from the arbitration you provided for me because in that case, the person in question became disabled after termination. Therefore, where Mr. Bard was employed while engaging in his potentially disabling act, he would be a Participant and be eligible for the disability pension....

**In the Matter of Paul Bard's Eligibility to Apply for Disability Pension        Page 6**

> In short, I would opine that if the Board decides that Mr. Bard is disabled ... he would be eligible for a disability pension because his disability was present (i.e., use of a substance) while he was employed and while he was a Participant in the Plan....

In January 2004, Bard submitted to the trustees an "Application for Disability Pension Benefits." He also submitted an "Attending Physician's Statement of Total and Permanent Disability," carrying the date of January 23, 2004 as the date of Bard's signature releasing this medical information to the Trustees. That document reads in part,

> 3. Diagnosis: The Pt. is under my care for counseling and psychotherapy since 3/8/02.[1] Dx 296.30/300.21. The Pt. is suffering from Depression and Anxiety Disorder. the Pt. is Disabled.
>
> 4. Is patient now totally and permanently disabled from his regular occupation? Yes.

On January 30, 2004, the trustees re-considered whether Mr. Bard was eligible to apply for a disability pension. The trustees deadlocked, 7 to 7, on that question, and voted to have the Fund's attorney present at their next meeting to advise them in person regarding Mr. Bard's eligibility.

At their meeting on February 25, 2004, the trustees conferred with Attorney Appugliese. There was discussion of the fact that Bard had worked right up until the date of his termination on July 23, 2001, and whether someone is disabled if he/she is working. After that consultation, the trustees deadlocked, 7 to 7, regarding whether to approve Bard's application for disability benefits. The minutes of that meeting further indicate,

> The Trustees stated for the record that if Mr. Bard's application were denied, he has the opportunity to present to the Trustees any further documentation he may obtain for further consideration of his application.

---

[1] The brief of the ILA trustees suggests that this date reads 3/8/00. The handwriting of that date entry (especially as photocopied) is a little difficult to read, and might be interpreted as either 3/8/00 or 3/8/02. However, Dr. Simone's letter of June 23, 2004 (part of UX 10) clarifies that Bard was under Simone's care since 3/8/**2002**, not 3/8/2000.

**In the Matter of Paul Bard's Eligibility to Apply for Disability Pension        Page 7**

Through his attorney, Robert Daidone, Esq., Bard took this opportunity to submit additional documentation and argument. Attorney Daidone, by letter to the trustees dated August 16, 2004, argued,

> As the enclosed materials indicate, <u>Mr. Bard has been totally and permanently disabled since being an employee at the Boston Shipping Association, to the present date</u>.... In support of his claim for these benefits, and <u>based upon his condition of being totally and permanently disabled at the date of his termination</u>, Mr. Bard submits the following.... (emphases added).

Included with Attorney Daidone's letter, among other things, were (1) the February 15, 2004 letter for Linda Lawless (quoted in part above, at page 3); (2) a July 14, 2004 letter from Elliott Segal, M.D., stating that Bard was under his care from October 2, 2001 to March 4, 2002, and that "In my opinion, Mr. Bard was totally and permanently disabled from his regular occupation prior to his employment termination on July 23, 2001;" (3) a June 23, 2004 letter from Dr. DeSimone, a psychotherapist, stating that Bard has been under her care since 3/8/2002, and that "Bard has been suffering from severe depression since 3/21/00,... was disabled in 3/21/00,... (and) is permanently and totally disabled at this time;" and (4) a determination of disability letter dated June 7, 2003 from the Social Security Administration which states, "We found that you became disabled under our rules on July 22, 2001...."

After receipt of Attorney Daidone's letter and attached materials, the trustees met again on August 25, 2004, and further considered Bard's application. The minutes of that meeting state,

> The Trustees again reviewed the request of Mr. Paul Bard to apply for a disability pension. Mr. Bard had submitted additional information regarding his disability. The Trustees again deadlocked on whether Mr. Bard was eligible to apply because he had worked up until he was terminated from employment. The Trustees agreed to go to outside counsel to determine if the issue was arbitrable.

Thereafter, the matter was moved to arbitration before the undersigned arbitrator.

<u>**In the Matter of Paul Bard's Eligibility to Apply for Disability Pension**</u>          Page 8

## DISCUSSION

The issue presented to the impartial umpire in this proceeding is a very narrow one, that being "whether or not Paul Bard is <u>eligible to apply</u> for a disability pension." The umpire in this instance, then, is to cast the tie-breaking vote only on this threshold, gatekeeper issue: does Bard have the opportunity to submit an application for the trustees' consideration? The potentially difficult substantive issues of (1) whether Bard is in fact is "totally and permanently disabled" within the meaning of the Plan by virtue of mental illness, or drug addiction, or a combination of the two, and (2) whether he became so disabled while still an employee under the BSA/ILA collective bargaining agreement, are not matters to be decided at this point.

The BSA Trustees' brief suggests that the issue now before the impartial umpire in fact does contain a substantive component as well, and is not strictly procedural. They assert that "an arbitral decision that Bard is eligible to file a claim for disability retirement under the Plan is tantamount to granting his claim." However, the stipulated issue in this case is <u>not</u>, "Is Paul Bard entitled to a disability pension pursuant to the Plan." Rather, the issue as presented is very narrowly crafted. The umpire observed that fact at the arbitration hearing, in a discussion that apparently was off the record, to be sure he correctly understood the intended scope of the issue. The gatekeeper concept was discussed, and no dissenting view was expressed. From these preliminary comments, then, it should be clear that if a decision is reached that Mr. Bard is eligible to apply, that does not imply anything regarding the merits of his disability claim.

The BSA Trustees primarily raise two arguments in support of their position that Bard is not eligible to submit an application for a disability pension. First, the BSA Trustees contend, a terminated employee is ineligible to apply for disability benefit -- even if the applicant became totally and permanently disabled prior to being terminated from employment under the BSA/ILA collective bargaining agreement. They argue that the language of the Pension Plan is clear and unambiguous in that regard; that Impartial Umpire Geronemus in an arbitration proceeding in 2002 so held (in the <u>McLaughlin</u> matter); and, that the BSA and ILA Trustees reached a unanimous decision to that same effect in the <u>Cocchi</u> case in 1993.

However, the language of the Pension Plan is <u>not</u> clear and unambiguous, that any terminated employee is <u>per se</u> ineligible to apply for disability. On the contrary, the language in Section 8.1 is entirely clear that so long as an individual with 15 years of service "becomes totally and permanently disabled" while still employed (a "Participant"), then the individual "shall be entitled to a disability benefit." The first sentence states in that regard,

> In the event that a Participant who has completed fifteen (15) years
> of service becomes totally and permanently disabled, such
> Participant shall be entitled to a disability benefit....

<u>**In the Matter of Paul Bard's Eligibility to Apply for Disability Pension**</u>          Page 8

## DISCUSSION

The issue presented to the impartial umpire in this proceeding is a very narrow one, that being "whether or not Paul Bard is <u>eligible to apply</u> for a disability pension." The umpire in this instance, then, is to cast the tie-breaking vote only on this threshold, gatekeeper issue: does Bard have the opportunity to submit an application for the trustees' consideration? The potentially difficult substantive issues of (1) whether Bard is in fact is "totally and permanently disabled" within the meaning of the Plan by virtue of mental illness, or drug addiction, or a combination of the two, and (2) whether he became so disabled while still an employee under the BSA/ILA collective bargaining agreement, are not matters to be decided at this point.

The BSA Trustees' brief suggests that the issue now before the impartial umpire in fact does contain a substantive component as well, and is not strictly procedural. They assert that "an arbitral decision that Bard is eligible to file a claim for disability retirement under the Plan is tantamount to granting his claim." However, the stipulated issue in this case is <u>not</u>, "Is Paul Bard entitled to a disability pension pursuant to the Plan." Rather, the issue as presented is very narrowly crafted. The umpire observed that fact at the arbitration hearing, in a discussion that apparently was off the record, to be sure he correctly understood the intended scope of the issue. The gatekeeper concept was discussed, and no dissenting view was expressed. From these preliminary comments, then, it should be clear that if a decision is reached that Mr. Bard is eligible to apply, that does not imply anything regarding the merits of his disability claim.

The BSA Trustees primarily raise two arguments in support of their position that Bard is not eligible to submit an application for a disability pension. First, the BSA Trustees contend, a terminated employee is ineligible to apply for disability benefit -- even if the applicant became totally and permanently disabled prior to being terminated from employment under the BSA/ILA collective bargaining agreement. They argue that the language of the Pension Plan is clear and unambiguous in that regard; that Impartial Umpire Geronemus in an arbitration proceeding in 2002 so held (in the <u>McLaughlin</u> matter); and, that the BSA and ILA Trustees reached a unanimous decision to that same effect in the <u>Cocchi</u> case in 1993.

However, the language of the Pension Plan is <u>not</u> clear and unambiguous, that any terminated employee is <u>per se</u> ineligible to apply for disability. On the contrary, the language in Section 8.1 is entirely clear that so long as an individual with 15 years of service "becomes totally and permanently disabled" while still employed (a "Participant"), then the individual "shall be entitled to a disability benefit." The first sentence states in that regard,

> In the event that a Participant who has completed fifteen (15) years
> of service becomes totally and permanently disabled, such
> Participant shall be entitled to a disability benefit....



**In the Matter of Paul Bard's Eligibility to Apply for Disability Pension          Page 10**

termination of employment. He simply did not need to reach the question presented in the instant proceeding, that being whether a terminated individual is eligible to apply for a disability pension when claiming that he became totally and permanently disabled while still an employee/participant. Thus, any comment Umpire Geronemus made regarding the issue now being arbitrated is only dictum.

Indeed, Umpire Geronemus cited as important precedent the action which the BSA and ILA Trustees unanimously had taken in 1993 in the Cocchi matter. A review of the paperwork from the Cocchi case shows that there, too, the issue was whether the individual could apply where his disability arose long after he had been terminated from employment.

Thus, neither McLaughlin nor Cocchi stand for proposition, as the BSA Trustees contend, that a terminated individual is per se ineligible to apply – even though claiming that he/she became totally and permanently disabled while still an employee/participant. Rather, this case apparently presents a matter of first impression.

Thus, the umpire is left only with the language of the Pension Plan itself, primarily Section 8.1, and with a December 2003 opinion letter from counsel to the Fund's Trustees. For the reasons set forth earlier, the language contained in Section 8.1 does not bar applications from terminated individuals, so long as the application asserts that the individual became totally and permanently disabled while still an employee/participant.

Counsel to the Pension Fund reached the same conclusion in his opinion letter dated December 31, 2003. Fund Counsel also saw the McLaughlin and Cocchi matters as distinguishable from the present case, based on the same reasoning set forth above by the undersigned umpire. Because I agree with the analysis of the Fund's attorney, based upon my independent review of the Fund Plan and the McLaughlin and Cocchi matters, I need not grapple here with the weight that an impartial umpire serving pursuant to Article XIII ought to give to an opinion from Fund Counsel.

The BSA Trustees cite Article IX, "Termination of Employment," which expressly provides a "deferred vested benefit" to terminated employees who meet various criteria set forth in that article. They note that while this article explicitly creates a right that discharged employees have to vesting and eligibility for a retirement pension, conspicuously absent is any right of such discharged employees to seek a disability pension. The BSA Trustees argue that where Article IX expressly creates a right to a retirement pension for discharged employees, but is silent about disability pensions for discharged employees, the fair conclusion to draw is that the parties did not intend to permit discharged employees to seek a disability pension.

I disagree. Article IX of the pension plan provides for a deferred retirement benefit to terminated individuals. That it does so, however, does not indicate or imply anything about an individual's possible entitlement to a disability pension. Retirement and disability benefits are separate and distinct pension benefits under the plan, each with its own set of eligibility criteria.

**In the Matter of Paul Bard's Eligibility to Apply for Disability Pension          Page 11**

The criteria for disability are set forth in article VIII, while the eligibility criteria for retirement pensions are set forth in articles IX and X. Quite simply, there is no language in Article VIII which bars a terminated employee from obtaining a disability benefit for a total and permanent disability which arose while that individual was still an employee.

The BSA Trustees make a second argument, as well, in support of their position that Bard is not eligible to submit an application for a disability pension. They assert that as a matter of indisputable fact, Bard was <u>not</u> disabled prior to his termination, since he was fully and gainfully employed as a competent crane operator right up until he was fired. Because he was able to and did perform his duties as a crane operator, ipso facto, he was not permanently and totally disabled while still an employee under the BSA/ILA collective bargaining agreement, the BSA Trustees contend.

That argument goes to the merits of Bard's disability application, however, not to the threshold issue of his eligibility to apply. The decision herein is only that Bard is eligible to apply for a disability pension, based upon his claim that he became totally and permanently disabled while he still was an employee under the BSA/ILA labor contract. It will now be up to the 14 Trustees to make a decision on the potentially difficult substantive issues of (1) whether Bard in fact is "totally and permanently disabled" within the meaning of the Plan by virtue of mental illness, or drug addiction, or a combination of the two, and (2) whether he became so "totally and permanently disabled" while still an employee under the BSA/ILA collective bargaining agreement.

arbdecCD:BSA&ILApensionArbPaulBardDec.wpd

## In the Matter of Paul Bard's Eligibility to Apply for Disability Pension        Page 9

There simply is nothing stating that an individual must still be a "participant" or "employee" at the time of submitting the application, nor is there anything that says a terminated employee is ineligible to apply for a disability pension.

Under that language, the application might be submitted after the person is terminated. The controlling issue is, was the applicant still an employee (and therefore a "Participant") at the moment in time that he/she "becomes totally and permanently disabled" – regardless of when the disability application was filed in relation to the termination of employment.

The BSA Trustees raise a policy argument in support of their proposed reading of Section 8.1. They suggest that discharged employees would have a financial incentive to file false claims for a disability pension. The Plan should not be forced to expend funds to defend against such likely frivolous claims, thereby depleting assets of the Plan available for employees who abide by the rules of the workplace.

However, policy arguments can be made in support of the ILA Trustees' proposed reading of Section 8.1, as well. Consider an employee with a progressively debilitating disease, undiagnosed at the time, who is progressively disciplined for poor and deteriorating attendance. Such an employee might be terminated, for just cause, based upon an inability to get to work with sufficient regularity. Would the Trustees want a rule that would preclude an application for disability pension filed after the fact of termination, based upon a medical determination (made after the termination date) that the individual in fact had become totally and permanently disabled prior to termination? The interpretation of Section 8.1 that the BSA Trustees advocate for here might well be overly broad and thus inconsistent with the underlying purpose of that provision.

More fundamentally, however, these policy arguments would go to the wisdom of amending (or not amending) the existing plan, rather than how to interpret the existing language. For the reasons already discussed above, Section 8.1 as currently written simply contains no requirement that an individual must still be an employee at the time that a disability application is filed; rather, the stated requirement is only that the individual must be a Participant/Employee at the point in time that he/she "becomes totally and permanently disabled...."

The BSA Trustees assert that in the McLaughlin matter, decided in 2002, Umpire Geronemus interpreted Section 8.1 as barring a terminated employee from eligibility to apply for a disability pension.

However, a careful reading of the McLaughlin opinion makes it clear that in that case, the applicant's disability did not arise until after he had been terminated. The applicant in that case was terminated on July 24, 1998. That termination was upheld by a grievance arbitrator in an award dated July 19, 1999. His disability did not arise, however, until December 7, 1999, at the earliest. Thus, Arbitrator Geronemus only was called upon to decide whether an individual is eligible to apply, where the claimed disability did not arise until well after the date of