UNITED STATES DISTRICT COURT
DISTRICT OF MASSACHUSETTS

_____
                                    )
PAUL BARD,                          )
                                    )
        Plaintiff,                  )        CIVIL ACTION
                                    )
v.                                  )        NO. 04-11946-NMG
                                    )
BOSTON SHIPPING ASSOCIATION –       )
INTERNATIONAL LONGSHOREMEN'S        )
ASSOCIATION PENSION PLAN,           )
a/k/a BSA-ILA PENSION PLAN,         )
a/k/a BSA-ILA TRUST FUND,           )
                                    )
        Defendant,                  )
_____)

REPLY BRIEF TO DEFENDANT'S OPPOSITION TO PLAINTIFF, PAUL BARD'S,
RENEWED MOTION FOR JUDGMENT ON THE PLEADINGS, AND/OR CASE
STATED AND/OR FOR SUMMARY JUDGMENT, AND TO DEFENDANT'S
OPPOSITION TO PLAINTIFF'S OBJECTION TO DEFENDANT'S
ADMINISTRATIVE RECORD, AND PLAINTIFF'S OPPOSITION
TO DEFENDANT'S CROSS-MOTION FOR JUDGMENT AS A MATTER OF LAW

        NOW COMES Plaintiff, Mr. Bard, and opposes Defendant's Cross-Motion For

Judgment As a Matter of Law.   Mr. Bard also files A Reply to Defendant's oppositions

set forth in its memorandum ("Defendant's Memorandum").    Defendant's oppositions

are in response to Plaintiff's Motion for Judgment On the Pleadings And/Or Case Stated

And/Or For Summary Judgment together with Memorandum ("Plaintiff's Motion and

Memorandum for Judgment"), and Plaintiff's Objection to the "Administrative Record"

Recently Supplied by Defendant.


    I.  INTRODUCTION:  CURRENT ISSUES PENDING;
        BOTH PARTIES REQUEST JUDGMENT AS A MATTER OF LAW.

In response to Plaintiff's Objection to The "Administrative Record" Recently Supplied By Defendant, Defendant now consents to include items omitted in its "Administrative Record"(See Section 5 of Defendant's Memorandum herein entitled "The Issue of the Administrative Record."). Plaintiff's Objection to the Administrative Record Recently Supplied By Defendant requests the Court to include various items in the Administrative Record (as originally included in Plaintiff's "Administrative Record " filed with his complaint). It also requests that the Defendant be estopped from raising arguments on new documents that it produced recently, but not earlier upon a request for all documents relied upon by the Trustees in administering Mr. Bard's claim; but it requests that Plaintiff be allowed to reference the new documents produced by Defendant. Defendant does not specifically address this latter request for relief and Plaintiff treats the issue as waived.

Given the Defendant's position, the Court has an "Administrative Record", the Administrative Record produced by Defendant plus/minus those items set forth in Plaintiff's Objection to the "Administrative Record," now consented to by Defendant. The Court has more than that. A question exists, as set forth in Plaintiff's Motion and Memorandum for Judgment, as to whether the Court will adopt Mr. Bard's position that the "Administrative Record" consists of only those actions in the "Administrative Record" as of August 26, 2005 (or 45 days later), or the Plan's position that the Court consider all actions through April, 2005 as the "Administrative Record" (the latter of which Plaintiff has called the "Supplemental Administrative Record.") A decision on this issue – what constitutes the Administrative Record when Defendant fails to act within the prescribed time limitations -- would provide the set of facts for this case.

The only question thereafter would be how to interpret those facts in the Administrative Record and the pleadings, and whether Plaintiff or Defendant, based upon those facts, would be entitled to judgment as a matter of law. *Both parties request judgment as a matter of law, and because one or more issues of fact may exist, the joint request for judgment as a matter of law is tantamount to a request for a judgment on the case stated, a case as stated and argued by both sides, rather than requests for summary judgment.* (See request described in Plaintiff's Motion and Memorandum for Judgment). Defendant has provided its interpretations of the facts set forth in the Administrative Record in Defendant's Memorandum, and Plaintiff rebuts those interpretations of the facts in Plaintiff's filings today. Both parties have provided their legal arguments in their respective Memorandums.

Mr. Bard requests that this Court refrain from remanding this case to the Board of Trustees, as the Administrative Record reflects that the Board is not an impartial, neutral board. Rather, the members of the Board – serving as agents to the Union and to the Employer – have an apparent financial interest in keeping the monies at stake in this case in the fund. Mr. Bard is no longer a member of the Union, is forever barred from the longshoremen industry, and from Mr. Bard's perspective, the Union has no apparent interest in protecting him relative to its active members. Directly or indirectly, it saves future contributions, as does Mr. Bard's former employer, Boston Shipping Association, by denial of this claim. And both the Union and Boston Shipping Association ("employer") have an interest in protecting active, Union member employees, at the expense of a person with Mr. Bard's status. Further, as argued below in ¶ 9 of the Plaintiff's Statement of Uncontested Facts, an apparent conflict of interest seems inherent

in allowing the Board of Trustees -- composed of the Union and employer -- to ultimately decide this claim, when the representatives of the Union and employer originally advised Mr. Bard how to proceed on this claim i.e. Mr. Bard was advised to await a Social Security determination of disability before making application under the BSA-ILA Plan. See Uncontested Facts, ¶ 9, below.

Moreover, upon review of the Administrative Record, the Board of Trustees seem to take extraordinary steps to ignore the evidence upon which the Plan provisions require a decision. The Trustees' ultimate decision was supposed to be based "upon competent medical evidence." See Plan, ¶ 8.1, A.R. 00023. Mr. Bard is not confident that the Board would objectively review the medical evidence if given another chance, upon a remand.

For these reasons, and because both parties are effectively requesting a judgment on their respective cases stated, and because Defendant has stated at the pre-trial conference that Defendant takes an "all or nothing approach," Mr. Bard requests that this Court decide this case on the pleadings, administrative record and arguments before it, and refrain from remanding this case to the Board of Trustees. Because the facts are set forth in the Verified Complaint, Answer to Complaint, and Administrative Record, and the scope of the Administrative Record is determinable by this court as a matter of law, the Court has the facts needed to make a determination "as a case stated."

II. THE FACTS – RESPECTIVE INTERPRETATIONS OF THE RECORD.

Mr. Bard sets forth below his Statement of Uncontested Facts as originally set forth in his Motion and Memorandum for Judgment, and as numbered in his original Motion

and Memorandum for Judgment.   Defendant states in Defendant's Memorandum that he

adopts Mr. Bard's Statement of Uncontested facts, except as he specifically states.

Below is each statement of facts as stated in Mr. Bard's Uncontested Statement of Facts,

followed by Defendant's argument, followed by Mr. Bard's response.  In certain cases,

Defendant had originally eliminated the document that supports the factual assertion in

his version of the Administrative Record, but now agrees that such respective documents

should become part of the Administrative Record.

     Mr. Bard reflects these original omissions that are now included in the

Administrative Record, together with cites to the source of the relevant documents.  Mr.

Bard cites either to Mr. Bard's version of the Administrative Record as originally

submitted with his complaint, designed as Plaintiff's Administrative Record ("P.A.R."),

or Plaintiff's Supplemental Administrative Record ("P.S.A.R."), as previously filed in

this Court after his complaint was filed,  respectively, or Defendant's version of the

Administrative Record ("A.R.").   He cites to either his own prepared Administrative

Record or Supplemental Administrative Record only when the relevant documents do not

exist in the Defendant's version of the Administrative Record.


UNCONTESTED FACTS


    1. The Boston Shipping Association hired Paul Bard as an employee on or before October 1, 1974.  See Boston Shipping Association Employee Service History Report, Plaintiff's Administrative Record ("P.A.R"), P.A.R. 43; ORIGINALLY ELIMINATED FROM DEFENDANT'S A.R.; DEFENDANT NOW CONSENTS TO INCLUSION.

    2. The Boston Shipping Association terminated Paul Bard's employment on July 23, 2001 See Boston Shipping Association letter of July 23, 2001.  P.A.R. 58. ORIGINALLY ELIMINATED FROM DEFENDANT'S A.R.; DEFENDANT NOW CONSENTS TO INCLUSION.

3. The BSA-ILA Plan admits that Paul Bard was a "Participant" in the BSA-ILA Plan for at least 30 years.  See BSA-ILA Pension Plan's Answer to Complaint, ¶ 8.

4. The BSA-ILA Plan admits that, on April 20, 2005, the date of Plaintiff's Amended Complaint, Paul Bard was still a "Participant" in the BSA-ILA Pension Plan.  See BSA-ILA Pension Plan's Answer to Complaint, ¶ 17.

5. The BSA-ILA Plan admits that Paul Bard is a "vested Participant" in the BSA-ILA Pension Plan.  See Letter from BSA-ILA Pension Trust Fund dated December 30, 2003, A.R. 000069 ("A.R." represents the proposed "Administrative Record" of Defendant, submitted to this Court on August 12, 2005).

6.  According to Article VIII of the BSA-ILA Pension Plan, "In the event that a Participant who has completed fifteen (15) Years of Service becomes totally and permanently disabled, such Participant shall be entitled to a disability benefit."  See A.R. 000023.

7.  The BSA-ILA Plan admits that Paul Bard is a Participant who has completed approximately 30 years of employment, with an average of over 1,000 Hours of Service for each Plan Year that he worked.   See BSA-ILA Pension Plan's Answer to Complaint, ¶ 10.

8.   Paul Bard has met the fifteen (15) Years of Service requirement of Article VIII. See ¶ 7 above; See Employee History Report, P.A.R. 43.  ORIGINALLY ELIMINATED FROM DEFENDANT'S A.R.; DEFENDANT NOW CONSENTS TO INCLUSION.

9.   The BSA-ILA Pension Plan does not deny that Mr. Bard was advised by a BSA employee, and Mr. Bard's ILA Union Delegate, to forego pursuing a "disability benefits" claim under the BSA-ILA Pension Plan, until the date that a determination of "disability" was made on Mr. Bard's Social Security claim.  See BSA-ILA Pension Plan's Answer to Complaint, ¶ 44.

    DEFENDANT'S ARGUMENT:
    DEFENDANT STATES THAT THIS IS IRRELEVANT BECAUSE THIS ADVICE WAS GIVEN BY SOMEONE OTHER THAN THE PLAN REPRESENTATIVES AND IS NOT ATTRIBUTABLE TO THE BSA-ILA PLAN.

    MR. BARD'S ARGUMENT:
    MR. BARD ASKS THE COURT TO TAKE NOTE OF THE PLAN DOCUMENT THAT HALF OF THE TRUSTEES OF THE PLAN ARE UNION REPRESENTATIVES, WHO ARE IN TURN MR. BARD'S FORMER *MANDATED* EXCLUSIVE REPRESENTATIVES, AND THE OTHER HALF ARE MR. BARD'S FORMER EMPLOYER'S REPRESENTATIVES: MR. BARD'S ADVICE ON PLAN MATTERS CAME FROM HIS FORMER EMPLOYER'S AND UNION REPRESENTATIVES ; HE WAS ILL-ADVISED BY THESE PERSONS.  BECAUSE THESE PERSONS WERE HIS AGENTS, THE PLAN'S AGENTS, AND THE EMPLOYER'S AGENTS, A CONFLICT OF INTEREST EXISTS AT THIS TIME. ALLOWING THE PLAN BOARD TO

CAST THE VOTES ON HIS DISABILITY BENEFITS CLAIM;  BECAUSE OF
THESE PRIOR AGENCY RELATIONSHIPS, THE ADVICE OF THESE
PERSONS (AGENTS) SHOULD BE ATTRIBUTABLE TO THE PLAN.
SEE P.A.R. 62 (UNION IS EXCLUSIVE AGENT); SEE ¶ 13.1 OF THE
THE PLAN AT A.R. 000028 (BOARD OF TRUSTEES IS HALF UNION
REPRESENTATIVES AND HALF EMPLOYER REPRESENTATIVES); SEE
A.R. 000052 (MR. BARD'S POSITION THAT HE WAS ILL-ADVISED).

10.  The Administrative Record in this case contains treating physician's reports, and no
     physician reports to the contrary, that state Paul Bard was totally and permanently
     disabled prior to his employment termination.  See ¶¶ 11– 19 below.

DEFENDANT'S ARGUMENT (APPLICABLE TO ¶¶ 10 - 18):

DEFENDANT STATES THAT SUCH REPORTS WERE SUBMITTED AFTER
THE TRUSTEES REFUSED TO ACCEPT THE PLAINTIFF'S APPLICATION.

PLAINTIFF'S ARGUMENT:
PLAINTIFF STATES THAT THE ADMINSITRATIVE RECORD REFLECTS
THAT ALL MEDICAL REPORTS AND OPINIONS IN THE ADMINISTRATIVE
RECORD WERE SUBMITTED ON OR BEFORE THE TRUSTEE'S AUGUST
26TH, 2004 REGULAR MEETING AS PART OF MR. BARD'S REQUEST FOR
RECONSIDERATION, AND THE TRUSTEES' STILL FAILED TO AWARD MR.
BARD HIS BENEFITS BASED UPON THE COMPETENT MEDICAL EVIDENCE
BEFORE THEM; FURTHER, MR. BARD STATES THAT THE SOCIAL
SECURITY ADMINISTRATION'S FINDINGS OF DISABILITY, WHICH WAS
BEFORE THEM IN OCTOBER, 2003, WAS THE ORIGINAL BASIS OF MR.
BARD'S OCTOBER, 2003 APPLICATION (SEE P.A.R. PAGE A.R. 50);
FURTHER, THE PLAN HAD DR. SIMONE'S OPINION OF MR. BARD'S TOTAL
AND PERMANENT DISABILITY AS OF JANUARY, 2004; AND MR. BARD'S
FURTHER REPRESENTATIONS OF DISABILITY DURING FEBRUARY, 2004
(SEE MR. BARD'S LETTER, A.R. 000052); THEIR OWN HEALTH CARE
PROFESSIONALS' OPINIONS OF MARCH, 2000 (SEE A.R. 000107-000108).
AND FURTHER, IF THE TRUSTEES HAD QUESTIONS, THEY HAD AMPLE
OPPORTUNITY TO ASK MR. BARD FOR FURTHER INFORMATION AT ALL
TIMES AFTER MR. BARD'S APPLICATION WAS SUBMITTED, AND WERE
REQUIRED TO DO SUCH (D.O.R. REGULATIONS).  THEY ADMIT THAT
THEY RECEIVED ALL REPORTS AND MEDICAL OPINIONS DECLARING
MR. BARD'S TOTAL AND PERMANENT DISABILITY WHILE HE WAS STILL
EMPLOYED BY THE DATE THEY ACTED ON MR. BARD'S MOTION FOR
RECONSIDERATION, AUGUST 25, 2004.

FURTHER, MR. BARD MAINTAINS THAT THE PLAN HAS CHANGED ITS
POSITION:  THE PLAN STATES ELSEWHERE THAT IT TOOK *NO ACTION
UNTIL APRIL, 2005* ON MR. BARD'S DISABILITY BENEFITS CLAIM.  SEE
DEFENDANT'S POSITION ON #28 HEREIN ("THE PLAN'S POSITION IS
THAT SINCE THERE WAS NO DECISION ON ACTUALLY AWARDING THE
PLAINTIFF A DISABILITY PENSION OR NOT, ARTICLE XIII OF THE PLAN
DOES NOT APPLY").   THUS, THE PLAN'S ARGUMENT THAT IT DID NOT
HAVE ALL THE DOCUMENTS UNTIL AFTER IT DECIDED MR. BARD'S
CLAIM IS IRRELEVANT BECAUSE THE PLAN'S POSITION IS THAT IT

DID NOT TAKE ACTION ON MR. BARD'S DISABIILITY BENEFITS CLAIM
BECAUSE IT *FIRST* HAD TO DETERMINE MR. BARD'S "ELIGIBILITY" TO
EVEN APPLY FOR BENEFITS (SO IT WOULD NOT HAVE MATTERED WHAT
IT HAD UNTIL AFTER IT FIRST DETERMINED MR. BARD'S "ELIGIBILITY
TO APPLY").

FINALLY,  MR. BARD MAINTAINS THAT THE PLAN DID NOT DATE STAMP
ITS DOCUMENTS AND CANNOT NOW REFUSE TO RECOGNIZE THE
DATES THAT DOCUMENTS WERE RECEIVED BY IT (SEE MR. BARD'S
ARGUMENT AND REQUEST FOR RELIEF IN HIS MOTION ENTITLED
"OBJECTION TO THE ADMINISTRATIVE RECORD RECENTLY SUPPLIED
BY THE DEFENDANT").

DEFENDANT'S ADDITIONAL ARGUMENT:
DEFENDANT STATES FURTHER THAT DOCUMENTS PROVIDED BY THE
SAME PROVIDERS DID NOT INDICATE THAT THE PLAINTIFF WAS
TOTALLY AND PERMANENTLY DISABLED AS OF THE DATE OF MR.
BARD'S TERMINATION AND IN FACT INDICATED THE CONTRARY.

PLAINTIFF'S ADDITIONAL ARGUMENT:
PLAINTIFF FIRST ARGUES THAT THE DATE OF DIAGNOSABILITY OF A
DISEASE MAY PRECEDE THE DATE OF ACTUAL DIAGNOSIS.  A MEDICAL
OPINION CAN ONLY FOLLOW DIAGNOSIS OF THE SYMPTOMS.
SOMETIMES SYMPTOMS DO NOT PRESENT THEMSELVES UNTIL A LATER
TIME, FOR A FINAL DIAGNOSIS.  A MORE COMPREHENSIVE REVIEW OF
THE MEDICAL RECORDS CAN BE DETERMINATIVE OF A DISABILITY AS
OF A PRIOR DATE.  THIS DISTRICT COURT ADOPTED A "LOOK BACK"
APPROACH IN THE ERISA DISABILITY BENEFITS CASE OF RADFORD
TRUST VS UNUM LIFE INSURANCE COMPANY, 321 F. SUPP 2d 226 (2004).
IN THIS CASE AT HAND,  DR. CHAKABARTI, M.D. OPINED THAT MR.
BARD HAD BEEN DISABLED AS OF MARCH 22, 2000.  THE
ADMINISTRATIVE RECORD REFLECTS THE EXISTENCE OF MR. BARD'S
SYMPTOMS AS OF THAT DATE, AS OBSERVED AND RECORDED BY THE
EMPLOYER'S OWN HEALTH CARE PROFESSIONALS, LAWLESS &
COMPANY.  FURTHER, ALL THREE MEDICAL DOCTORS, TREATING
PHYSICIANS OF MR. BARD, OPINE THAT MR. BARD WAS DISABLED
WHILE STILL EMPLOYED.

WHEN PLAINTIFF STATES THAT NO DOCUMENTS ARE CONTRARY, HE
MAINTAINS THAT CERTAIN REFERENCES IN REPORTS BEGINNING WITH
"SINCE" DO NOT CONSTITUTE  CONCLUSIONS AS TO THE ORIGINAL
ONSET OF MR. BARD'S DISABILITY; RATHER THE TERM IS TEMPORAL;
ALL FINAL, RECENT, MEDICAL CONCLUSIONS REFLECT MR. BARD'S
DISABILITY EXISTED WHILE HE WAS STILL EMPLOYED; AND THE
BOSTON SHIPPING ASSOCIATION'S OWN HEALTH CARE
PROFESSIONALS, LAWLESS & COMPANY QUESTIONED MR. BARD'S
DISABILTY DURING MARCH, 2000 (LATER CONFIRMED AS A DATE FOR
ONSET BY DR. CHAKABARTI, M.D.).

11.  Elliott Segal, M.D., a *treating* physician of Paul Bard, provided a medical opinion

that Mr. Bard was totally and permanently disabled prior to his employment termination on July 23, 2001.  See A.R. 000095. SEE ¶ 10 ABOVE.

12. Dr. Kishanlal Chakrabarti, M.D., a *treating* physician of Paul Bard, provided a medical opinion that Paul Bard was disabled since 3/21/00, and was still totally and permanently disabled on June 23, 2004.  See A.R. 000096. SEE ¶ 10 ABOVE.

13. Dr. Abla De Simone, a *treating* physician of Mr. Bard, provided a medical opinion that Paul Bard was disabled since 3/21/00.  See A.R. 000096. SEE ¶ 10 ABOVE.

14. The Social Security Administration made a determination that Paul Bard was disabled retroactive to July 22, 2001, the day before Mr. Bard was terminated from employment.  See A.R. 000098. SEE ¶ 10 ABOVE

15. Lawless & Company, a medical company engaged by Boston Shipping Association, issued three Reports in the Year 2000 evidencing Mr. Bard's disability in that year.  See A.R. 000093. SEE ¶ 10 ABOVE.

16. Dr. Alba Simone, provided an opinion that Mr. Bard was still totally and permanently disabled on January 23,  2004.  See A.R. 0000100. SEE ¶ 10 ABOVE.

17. Mr. Bard, himself, provided an Affidavit, stating that he was totally and permanently disabled prior to his employment termination at Boston Shipping Association, and continuing to August 13, 2004.  See  A.R. 0000101. SEE ¶ 10 ABOVE

18. No expert medical opinions exist in the administrative record other than those that support a finding that Mr. Bard is disabled.  See Answer to Complaint, ¶ 147; See Administrative Record.  SEE ¶ 10 ABOVE.

19. The Board of Trustees of the BSA-ILA Pension Plan did not request to depose any of Paul Bard's physicians, request that Paul Bard be examined by an independent medical doctor, or otherwise request further information, in order to evaluate Mr. Bard's "permanent and total disability."  See Administrative Record.

20. The administrative record does not contain reasons to justify a denial of Paul Bard's condition of "permanent and total disability."  See Administrative Record.

DEFENDANT ARGUES:
THAT THE PLAN BELIEVES THAT THE RECORD DOES
CONTAIN EVIDENCE JUSTIFYING THE DENIAL OF BENEFITS
BECAUSE IT IS REASONABLE TO CONCLUDE THAT
AN INDIVIDUAL WHO WORKED WITH NO PERFORMANCE-BASED
PROBLEMS UP UNTIL THE DATE OF HIS DISCHARGE WAS NOT
TOTALLY AND PERMANENTLY DISABLED FROM HIS USUAL
EMPLOYMENT AS A CRANE OPERATOR WHILE HE WAS EMPLOYED.
FURTHER, HE ARGUES THAT THE REVISIONS TO THE PLAINTIFF'S
MEDICAL PROVIDERS' OPINIONS RAISE A FAIR SUSPICION.

PLAINTIFF ARGUES:

THE ADMINISTRATIVE RECORD REFLECTS <u>NO</u> REASONING OF THE TRUSTEES REVIEWING, CRITIQUING, OR DISCUSSING THE COMPETENT MEDICAL EVIDENCE SUBMITTED BY MR. BARD.  THE LETTER OF APRIL 28, 2005 THAT THE PLAN SENT TO MR. BARD MERELY SAYS: "PURSUANT TO ARTICLE VIII (DISABILITY BENEFITS) SEC. 8.1 THE BOARD OF TRUSTEES IN ITS SOLE JUDGMENT, FOUND THAT THE APPLICANT, MR. PAUL BARD, WAS NOT TOTALLY AND PERMANENTLY DISABLED PRIOR TO HIS TERMINATION."  SEE A.R. 000129.  THE PLAN DOES NOT ALLOW THE TRUSTEES TO MAKE A DECISION <u>ON THEIR PERSONAL KNOWLEDGE OR ON HEARSAY</u> THAT MR. BARD HAD "NO PERFORMANCE BASED PROBLEMS" UP TO MR. BARD'S DATE OF DISCHARGE.  <u>MR. BARD'S PERFORMANCE RECORD IS NOT PART OF THE ADMINISTRATIVE RECORD.  CONTRARY TO THE PLAN'S MANDATE OF A TRUSTEES' DECISION BASED "UPON COMPETENT MEDICAL EVIDENCE." THE TRUSTEES BASE THEIR DECISION ON POSSIBLE FIRST HAND OBSERVATION OR HEARSAY,  EITHER OR BOTH OF WHICH ARE OUTSIDE THE ADMINISTRATIVE RECORD, AND EITHER OR BOTH OF WHICH ARE NOT COMPETENT MEDICAL EVIDENCE .</u>  NOTHING IN THE ADMINISTRATIVE RECORD REFLECTS MR. BARD'S PERFORMANCE EXCEPT THE LETTERS REGARDING MR. BARD'S IMPAIRMENTS WHILE ON THE JOB, AND WHILE MR. BARD DOES NOT CONSENT TO IT BEING PART OF THE RECORD, THE UMPIRE, CALLED AN "ARTIBTRATOR" , IN HIS STATEMENT AND VOTE THAT DEFENDANT'S ARGUE SHOULD BECOME PART OF THE ADMINISTRATIVE RECORD, HE STATES THAT **"ON JULY 16, 2001, BARD WAS OPERATING MGM#5 WHEN IT WAS INVOLVED IN A COLLISION WITH A TRUCK**." (**<u>SEE</u> A.R. 00121 OF DEFENDANT'S ADMINISTRATIVE RECORD).  THIS WAS APPROXIMATELY ONE WEEK BEFORE MR. BARD WAS DISCHARGED.  THUS MR. BARD WAS NOT FREE OF PERFORMANCE ISSUES AS THE TRUSTEES SEEM TO BELIEVE ON HEARSAY INFORMATION.**  <u>SEE</u> A.R. 000121. OTHERWISE, MR. BARD ASKS THAT THE COURT TAKE NOTE THAT MR. BARD WAS NOT PROPERLY PERFORMING HIS JOB, WHILE IMPAIRED MENTALLY AND UNDER THE INFLUENCE, AS A HEAVY EQUIPMENT OPERATOR, AS SHOWN IN THE ADMINISTRATIVE RECORD.

21. Article VIII of the Plan provides that "The Board, *upon competent medical evidence,* shall be the sole judge of whether a Participant is disabled." See Plan, Article VIII, A.R. 000023.

22.  The administrative record contains *competent medical evidence* establishing Paul Bard's condition of "permanent and total disability". See ¶ ¶ 10 - 19 above.

DEFENDANT'S ARGUMENT:
DFENDANT STATES THAT THE PLAN'S POSITION IS THAT THE RECORD DOES NOT ESTABLISH THAT THE PLAINTIFF WAS TOTALLY AND PERMANENTLY DISABLED WHILE HE WAS EMPLOYED.

PLAINTIFF'S ARGUMENT:

PLAINTIFF'S RESPONSE IS THAT THE COMPETENT MEDICAL EVIDENCE THAT EXISTS BEFORE THE TRUSTEES IS CONCLUSIVE; IT CANNOT BE OVERRIDDEN WITH PERSONAL OBSERVATION OR HEARSAY INFORMATION, WHICH IS WHAT THE PLAN NOW ADMITS HAS HAPPENED.

23.  The Board of Trustees first denied Paul Bard's request for disability benefits on October 29, 2003, based upon an arbitrator's decision "which stated than an individual which had been terminated from employment was not eligible to apply for pension."  See Minutes of Regular Meeting of the Trustees of the BSA-ILA Pension Plan, October 29, 2003, A.R. 000045.

DEFENDANT'S ARGUMENT (APPLICABLE TO ¶¶ 23-27):

DEFENDANT STATES THAT THE PLAN'S THRESHOLD ISSUE WAS WHETHER OR NOT THE PLAINTIFF COULD EVEN APPLY FOR A DISABILITY PENSION POST EMPLOYMENT.

PLAINTIFF'S ARGUMENT:
PLAINTIFF STATES: DEFENDANT'S POSITION "THAT PLAINTIFF COULD NOT EVEN APPLY" WAS NOT BASED UPON PLAN PROVISIONS THAT IT MENTIONS ANYWHERE IN THE ADMINSTRATIVE RECORD, AS IT WOULD HAVE BEEN REQUIRED TO DO BY DEPARTMENT OF LABOR REGULATIONS.  MR. BARD WAS PRECLUDED FROM MAKING ARGUMENT ABOUT THE INTERPRETATION OF ANY SUCH PLAN PROVISIONS BECAUSE OF THE FAILURE OF THE PLAN TO REFER TO THEM.

SECONDLY, PLAINTIFF STATES THAT THE DECISION OF THE TRUSTEES, IN ¶ 23 DIRECTLY ABOVE, WHICH IS BASED UPON THE MINUTES OF THE OCTOBER 29, 2003 TRUSTEES' MEETING, CLEARLY ESTABLISHES THAT THE PLAN DENIED MR. BARD'S APPLICATION "BECAUSE HE WAS NOT ELIGIBLE TO APPLY FOR PENSION."  ELSEWHERE HEREIN, DEFENDANT HAS MAINTAINED THAT IT TOOK NO ACTION ON MR. BARD'S APPLICATION, AND BECAUSE OF SUCH, THE APPEALS PROCESS - - WHICH PROVIDED 45 DAYS TO MAKE A DECISION  ON MR. BARD'S DISABILITY BENEFITS CLAIM (ACCORDING TO THE DEPARTMENT OF LABOR REGULATIONS) AND 60 DAYS (ACCORDING TO THE PLAN) - - NEVER COMMENCED.  SEE E.G. DEFENDANT'S ARGUMENT BELOW FOR NUMBERS 28 THROUGH 29, WHERE DEFENDANT STATES "THE PLAN'S POSITION IS THAT SINCE THERE WAS NO DECISION ON ACTUALLY AWARDING THE PLAINTIFF A DISABILITY PENSION OR NOT, ARTICLE XIII OF THE PLAN DOES NOT APPLY." AND #35:  "THE PLAN'S POSITION IS THAT NO ACTION WAS REQUIRED BECAUSE THE ARBITRATION WAS PENDING."

DEFENDANT'S  ADDITIONAL ARGUMENT:
DEFENDANT SEEMS TO STATE THAT HE HAS NO OBJECTION TO INCLUDING THE PRIOR ARBITRATION DECISION IN THE ADMINISTRATIVE RECORD.

PLAINTIFF'S ADDITIONAL ARGUMENT:
PLAINTIFF STATES:  BUT IT IS NOT DEFENDANT THAT OBJECTS TO
INCLUDING IT, IT IS PLAINTIFF THAT OBJECTS TO INCLUDING IT!  SEE
MR. BARD'S OBJECTION TO THE ADMINISTRATIVE RECORD RECENTLY
SUPPLIED BY DEFENDANT.  THE ARBITRATOR'S DECISION WAS LEFT
OUT OF THE DOCUMENTATION PRODUCED TO MR. BARD AFTER MR.
BARD'S REQUEST FOR ALL DOCUMENTATION THAT SUPPORTS THE
PLAN'S DECISION.   IF, HOWEVER, DEFENDANT IS REFERRING TO ¶ 25
BELOW, PLAINTIFF WITHRDRAWS THIS PARTICULAR ADDITIONAL
ARGUMENT.

DEFENDANT'S ADDITIONAL ARGUMENT:
DEFENDANT STATES THAT THE TRUSTEES DEADLOCKED ON THE
PLAINTIFF'S ABILITY TO APPLY FOR A DISABILITY PENSION, AND
THAT MATTER WAS ARBITRATED.

PLAINTIFF'S ADDITIONAL ARGUMENT:
PLAINTIFF STATES THAT THE OCTOBER 29, 2003, REGULAR MEETING
MINUTES PROVIDE IN PART:

….THE FOLLOWING PENSION APPLICATIONS WERE ACTED UPON (SEE
ATTACHED):    THE TRUSTEES REVIEWED A REQUEST BY MR. PAUL
BARD TO APPLY FOR DISABILITY BENEFITS.  THE TRUSTEES
REFERENCED A PRIOR ARBITRATORS DECISION WHICH STATED THAT
AN INDIVIDUAL WHICH HAD BEEN TERMINATED FROM EMPLOYMENT
WAS NOT ELIGIBLE TO APPLY FOR PENSION.  MR. BARD, WHO HAD
BEEN TERMINATED, WOULD THEREFORE NOT BE ELIGIBLE TO APPLY
FOR PENSION…

 GIVEN THE ABOVE, MR. BARD'S APPLICATION FOR DISABILITY
 PENSION BENEFITS WAS DENIED ON OCTOBER 29, 2003, JUST AS
 PLAINTIFF STATES IN ITS UNDISPUTED FACTS.

24. Mr. Bard appealed the decision of the Board of Trustees before
    December 30, 2003.  See Letter of BSA-ILA Plan dated December 30, 2003:
    "Mr. Bard has appealed the decision of the Board and is requesting that the
    Fund's attorney review this decision and offer their opinion on his request."
    See A.R. 000069.  The same Board of Trustees considered Paul Bard's appeal of his
    claim for disability benefits on January 30, 2004, and reached a "deadlock"
    decision, and tabled the issues for the next month.  Regular Meeting of
    the Trustees of the BSA-ILA Pension Plan, January 30, 2004.  A.R. 000046.
    SEE #23 ABOVE.

25. The same Board of Trustees voted seven to seven on Mr. Bar's appeal
    of his claim for disability benefits on February 25, 2004.  See Minutes
    of the Trustees of the BSA-ILA Pension Plan, February 25, 2004., P.A.R. 41.
    ORIGINALLY ELIMINATED FROM DEFENDANT'S A.R.; DEFENDANT
    NOW CONSENTS TO INCLUSION.   SEE #23 ABOVE.

26.  According to the BSA-ILA Plan's Answer to Mr. Bard's Complaint,

at the February 25, 2004 Board meeting, the appeal "was not decided one way or another because the vote was a deadlock." See Answer to Complaint, ¶ 66. According to the Summary Plan Description, if a plan participant does not receive a decision within the time limits described, the participant can assume that the request for benefits has been denied, and the participant can proceed with appeal procedures. See P.A.R. 12 (Summary Plan Description Page 7). ORIGINALLY ELIMINATED FROM DEFENDANT'S PROPOSED ADMINISTRATIVE RECORD; DEFENDANT NOW CONSENTS TO INCLUSION. SEE #23 ABOVE.

27. But the Trustees stated in the record at the same meeting that "if Mr. Bard's application were to be denied, he has the opportunity to present to the Trustees any further documentation he may obtain for further consideration of his application." See Minutes of the Regular Meeting of the Trustees of the BSA-ILA Pension Plan, February 25, 2004, P.A.R. 41. ORIGINALLY ELIMINATED FROM DEFENDANT'S PROPOSED ADMINISTRATIVE RECORD; DEFENDANT NOW CONSENTS TO INCLUSION . SEE #23 ABOVE.

28. According to Article XIII, Paragraph 13.11 "The Board must render a decision regarding the appeal of the claimant not later than sixty (60) days after a claimant's request for review was received. However, if there is a need to hold a hearing, a decision is to be rendered not later than one hundred twenty (120) days after the receipt of the request for review." See A.R. 000031.

DEFENDANT'S ARGUMENT (APPLIES TO ¶¶ 28-29):

DEFENDANT STATES THAT THE PLAN TOOK NO ACTION ON MR. BARD'S APPLICATION, AND THEREFORE ARTICLE XIII OF THE PLAN DOES NOT APPLY.

PLAINTIFF'S ARGUMENT:

THE MINUTES OF OCTOBER 23, 2003 CLEARLY REFLECT A DENIAL OF MR. BARD'S APPLICATION ON THE BASIS OF INELIGIBILITY TO APPLY, AND THEREFORE, ARTICLE XIII, ¶ 13.11, DOES APPLY.

29. The Board of Trustees did not send a written status of their board vote, nor a decision on Mr. Bard's appeal for disability benefits, to Mr. Bard within 60, nor 120 days, following the December, 2003 appeal, nor even following the February 25, 2004 meeting. See Administrative Record.

DEFENDANT MAKES THE SAME ARGUMENT AS IN ¶ 28 ABOVE, AND PLAINTIFF MAKES THE SAME COUNTER ARGUMENT AS IN ¶ 28 ABOVE.

30. On June 28, 2004 Paul Bard requested copies of all documents "pertaining to Mr. Bard's rights to pension disability benefits, including the pension plan itself, any claims filed, any documentation regarding decisions made, any board votes, memos, reasons for denial, his personnel file, and any other documents relied upon." See

Letter dated June 28, 2004, P.A.R. 1; and Authorization dated June 24, 2004, A.R. 000068. LETTER OF 6/28/04 ORIGINALLY ELIMINATED FROM DEFT'S PROPOSED ADMINISTRATIVE RECORD EVEN THOUGH DOCUMENTS PRODUCED BY THE PLAN WERE IN RESPONSE TO PLAINTIFF'S (THIS) LETTER REQUEST FOR RELEVANT DOCUMENTS; DEFENDANT NOW CONSENTS TO INCLUSION.

31. According to the Administrative Record, the Board of Trustees took no further action on Paul Bard's disability appeal. Mr. Bard thereafter, in a letter dated August 16, 2004, requested reconsideration of his appeal, re-submitting and supplementing his appeal with additional medical evidence. See Administrative Record, 000090. Mr.Bard had a right to request reconsideration. See Summary Plan Description, P.A.R. 15 (Summary Plan Description, page 22): ORIGINALLY ELIMINATED FROM DEFENDANT'S PROPOSED ADMINISTRATIVE RECORD; DEFENDANT NOW CONSENTS TO INCLUSION.

32. On August 16, 2004, Paul Bard submitted and resubmitted additional evidence of "permanent and total" disability including: Lawless & Company's three reports evidencing disability in the year 2000, Elliot Segal, M.D.'s expert opinion regarding Mr. Bard's disability while still employed, Dr. Alba De Simone's expert opinion regarding Mr. Bard's disability while still employed; Kishanlal Chakrabarti, M.D.'s expert opinion regarding Mr. Bard's disability while still employed; The Social Security Administration's determination of Mr. Bard's disability while still employed; Emma Rogers' (Counselor of Mr. Bard) opinion regarding Mr. Bard's chemical dependency during 1999 and 2000); Dr. Alba De Simone's updated statement of disability as of 1/23/04; and Mr. Bard's own Affidavit regarding his disability as of August, 2004. See A.R. 000093 – 000102.

33. On August 25, 2004, the Board of Trustees again "did not come to agreement on whether Mr. Bard was eligible to apply for pension due to your termination of employment on July 23, 2001." See Letter from BSA-ILA Pension Trust Fund dated August 26, 2004, A.R. 000103.

34. The documents produced by the BSA-ILA Plan for Mr. Bard pursuant to his June 20, 2004 request for his pension documentation, together with the medical information submitted and re-submitted on August 16, 2004 by Mr. Bard with a request for reconsideration of his appeal, together with the response of the BSA-ILA Plan on August 25, 2004 is what is known as herein as the "Administrative Record." THIS IS SUBJECT TO THE COURT'S RULING ON PLAINTIFF, MR. BARD'S, MOTION AND MEMORANDUM FOR JUDGMENT.

35. The Board of Trustees did not decide Mr. Bard's appeal at its regularly scheduled meeting of August 25, 2004, nor send a decision to Paul Bard regarding his appeal within 60 days, nor 120 days, from the February 25, 2004 meeting date; nor within 60 or 120 days from the August 16, 2004 request for reconsideration of his appeal. See Administrative Record.

DEFENDANT'S ARGUMENT:

DEFENDANT STATES THAT NO ACTION WAS REQUIRED BECAUSE THE

ARBITRATION WAS PENDING.

PLAINTIFF'S ARGUMENT:

PLAINTIFF STATES THAT THE MINUTES OF OCTOBER 23, 2003 REFLECT THAT MR. BARD'S CLAIM FOR DISABILITY BENEFITS WAS DENIED, AND A TIMELY DECISION WAS REQUIRED.

PLAINTIFF FURTHER STATES THAT ¶ 13.11 ALLOWS FOR AN "UMPIRE" TO BREAK A TIE VOTE; BUT DATES FOR DECISION ARE NOT EXTENDED UNDER THE PLAN PROVISIONS TO BREAK SUCH TIE VOTE.

36. Paul Bard filed this lawsuit on September 7, 2004.  See Court Record.
37. On September 17, 2004, The Board of Trustees accepted service of the complaint, indicated that an Answer was due by October 12, 2004, requested additional time to answer the complaint, and proposed to stay the case pending arbitration of the claim. See Letter of BSA-ILA dated September 22, 2004, Plaintiff's Supp..A.R. 9. ORIGINALLY ELIMINATED FROM DEFENDANT'S PROPOSED ADMINISTRATIVE RECORD; DEFENDANT NOW CONSENTS TO INCLUSION.

38. Thereafter, Plaintiff's counsel agreed to extend the due date for an answer, preserving all rights to argue that "administrative remedies has been exhausted" by the Plan, and preserving argument that no ERISA rights were being waived.

39. On December 4, 2004, Plaintiff's counsel received notice from Attorney Wanger, counsel for the International Longshoremen's Association ("ILA") of an arbitration to be held on December 20, 2004, regarding resolution of a "trustee deadlock" on Paul Bard's "entitlement to apply for disability pension".  See Letter from Attorney Wanger, Plaintiff's Supp.A.R. 10. ELIMINATED FROM DEFENDANT'S PROPOSED ADMINISTRATIVE RECORD EVEN THOUGH SENT TO PLAINTIFF REGARDING PLAINTIFF'S CLAIM (ELIMINATION FROM ADMINISTRATIVE RECORD OBJECTED TO ON TODAY'S DATE).

40. On December 13, 2004, Plaintiff's counsel again granted an extension to file an answer to the complaint,  and the refused "to waive any of Mr. Bard's rights" and reserved  "any and all rights that Mr. Bard has with respect to his ERISA benefits."  See Letter of Robert E. Daidone dated December 13, 2004, A.R. 000110.

41. On December 17, 2004, Paul Bard filed an emergency motion for temporary restraining order with this court for the purpose of requesting that the arbitration be stayed until the parties clarified that Mr. Bard's rights would not be determined as final and binding, and that all of Mr. Bard's ERISA rights would be preserved.  See Emergency Motion for Temporary Restraining Order filed on December 17, 2004, See Court Docket, Plaintiff's Motion For Temporary Restraining Order and Preliminary Injunction. ORIGINALLY ELIMINATED FROM DEFENDANT'S PROPOSED ADMINISTRATIVE RECORD; BUT DEFENDANT NOW CONSENTS TO INCLUSION.

42. On December 17, 2004, Counsel for BSA-ILA recognized that Mr. Bard's rights would be preserved, and not waived, if the emergency motion for temporary restraining order were withdrawn. See Letter of Attorney Geoffrey P. Wermuth, A.R. 000116.

43. On or about December 17, 2004, Plaintiff's counsel requested that the Court not hold a hearing on its emergency motion for temporary restraining order.

44. On December 20, 2004, the BSA-ILA Board of Trustees held a meeting before an arbitrator with its request for the arbitrator to determine "Whether or not Paul Bard is eligible to apply for a disability pension?" See Award of Arbitrator dated March 4, 2004, A.R. 000118 – 000128.

45. On March 4, 2004, the arbitrator determined that Mr. Bard was eligible to apply for disability benefits. See Award of Arbitrator dated March 4, 2004, A.R. 000118 – 000128.

46. Approximately March 31, 2004, Counsel for the ISA-BLA Plan verbally informed Counsel for Paul Bard that the Trustees denied Mr. Bard's application for benefits.

47. No letter or correspondence with reasons for denial was sent by the BSA-ILA Plan as of April 21, 2004, and on such date, Plaintiff filed an Amended Complaint. See Court Docket, Amended Complaint.

48. On April 28, 2004, *after* this Amended Complaint was filed and served upon the BSA-ILA Plan, the BSA-ILA Plan wrote Paul Bard a letter denying his claim for disability benefits for the following reason: "Pursuant to Article VIII (Disability benefits), sec. 8.1 the Board of Trustees, in its sole judgment, found that the applicant, Mr. Paul Bard, was not totally and permanently disabled prior to his termination." See BSA- ILA Plan Letter dated April 28, 2005, A.R. 000129.

49. In his Answer to the Amended Complaint, Defendant BSA-ILA waives "failure to exhaust administrative remedies" as an affirmative defense. See Court Docket, BSA-ILA's Answer to Complaint, Paragraphs 122, 123, 124, 125 and 126.


III.  MR. BARD'S OPPOSITION TO THE LEGAL ARGUMENTS MADE IN DEFENDANT'S CROSS-MOTION FOR JUDGMENT AS A MATTER OF LAW, AND IN DEFENDANT'S OPPOSITION TO PLAINTIFF'S MOTION FOR JUDGMENT ON THE PLEADINGS AND/OR CASE STATED AND/OR FOR SUMMARY JUDGMENT.


First, Plaintiff specifically addresses (i) each of the statements of Defendant's

Cross-Motion For Judgment As a Matter of Law summarily,  then addresses (ii)

Defendant's Memorandum in Support of this Motion as well as (iii) Defendant's

Oppositions to (a) Plaintiff's Motion for Judgment on the Pleadings And/Or Case Stated

And/Or Summary Judgment and (b) Plaintiff's Objection to the "Administrative Record"

Supplied by Defendant.

    A.  Defendant's Summary Response to Each of the Statements Within
        <u>Defendant's Motion For Judgment As a Matter of Law</u>.

    Defendant makes five general statements in his Motion for Judgment As a Matter

of Law.  Each are summarily addressed below:

    1.  That the Plan does provide discretion to the Trustees, and ordinarily, the arbitrary

and capricious standard of review would be appropriate.  In this case, however, the

Trustees' discretion under the Plan provision that governs disability benefits (Article VIII

of the Plan) limits the Trustees discretion to a decision "based upon competent medical

evidence."    Further, the Plan failed to make a decision in a timely way on an

Administrative Record that consisted of three doctors' opinions, a Social Security finding

that Mr. Bard was disabled while still employed, and the Boston Shipping Association's

own health care professionals' recognition of Mr. Bard's symptoms during March, 2000.

Further, after review of the medical records going back to the year 2000, Dr. Chakabarti,

M.D. opined that Mr. Bard was disabled, as of March, 2000 (Mr. Bard has requested

relief from July 22, 2001, not March, 2000).  These opinions are all part of the

Administrative Record, and together provide proof of Mr. Bard's disability while still

employed;

    2.  That the Trustees have failed to follow the mandates of the Plan -- to determine

Mr. Bard's disability benefits on the basis of "competent medical evidence" -- and failed

and/or refused to make a decision within the time requirements of the Plan even though

the record is in Mr. Bard's favor.   Their ultimate decision – rendered during April, 2005 after this lawsuit was already pending for several months, and also several months following Mr. Bard's application during October, 2003, is seriously flawed, because their decision is based upon their own personal observations, perceptions or hearsay:  they say "Mr. Bard couldn't have been disabled because he worked up to the date of his termination."  The Trustees fail to base their decision on the competent medical evidence before them.  That evidence reflects a mental disability, not a physical disability. Outwardly Mr. Bard may have looked fine to them, but inside Mr. Bard was permanently and totally disabled. This was determined by three doctors, the Social Security Administration, and questioned by the employer's own health professionals as far back as March, 2000 (when Mr. Bard exhibited symptoms evidencing such disabilities), and it was later confirmed by Mr. Bards *treating* medical doctors that he had his disability on this prior date.  And by failing to rely upon doctor's letters in making their decision on Mr. Bard's disability, the Trustees deviated from the Plan's prior precedent and practice. See P.A.R. 41 ("…the Fund has historically relied on doctor's letters in making decisions on disability applications…").

3.  Based on the Administrative Record, which is composed of competent medical evidence that supports Mr. Bard's position, and contains no contrary competent medical evidence against him, Mr. Bard should prevail, and Mr. Bard asks that this Court enter a judgment on such record on a *de novo* basis, as the Trustees improperly failed/refused to grant Mr. Bard his disability benefits during the time limits of the Plan, the time limits of the Department of Labor Regulations, or even after the fact, and Mr. Bard does not think that he would get a fair adjudication upon a remand to the same Board of Trustees.   The

Board of Trustees is composed of Union and Employer representatives; These same persons have forever barred Mr. Bard from working in his industry.  The Union and Employer obtain a financial benefit by refusing to grant Mr. Bard his benefits, and the future costs for the Union and Employer to fund the Plan, and their respective entities costs', would be less by not having to make payment to Mr. Bard.

4.   The Plan provides benefits to Participants in the Plan who have 15 Years of Service and who become disabled, not just employees who experience an onset while being actively employed.  Mr. Bard just happened to become disabled while he was still employed, and his benefits should be paid retroactively to the date that he became disabled.

5.   The parties both appear to agree that this case can be decided on the case stated before the court at this time, as each has requested judgment as a matter of law.

   B.  Defendant's Response to Defendant's Legal Arguments
       As Set Forth In Its Memorandum of Law in Support
       Of  Its Motion for Cross-Judgment, and Oppositions to Defendant's
       Motion For Judgment on the Pleadings And/Or Case Stated And/Or
       For Summary Judgment, and Plaintiff's Objection to the
       "<u>Administrative Record Supplied By Defendant</u>.

       First, Plaintiff responds to Defendant's Introduction in its Memorandum of Law, and then its four major legal arguments.

   1.  <u>Plaintiff's Response to Defendant's Introduction</u>.

       The Defendant makes general statements in his Introduction.  Plaintiff responds as follows:

       a.  Defendant states that the key issue is whether or not the Plaintiff was "totally and permanently disabled" while he was employed.

Mr. Bard states that the issue is whether Mr. Bard became "totally and permanently" disabled while he was a "Participant" in the plan.  Once Mr. Bard was a "Participant" he became entitled to all benefits as a "Participant" unless of course a plan provision were to require that a person be both a "Participant" and actively employed at the time of onset, for the benefit to incur, which is not the case in this Plan.  The Summary Plan Description provides disability benefits to "members" of the plan.  See Plaintiff's Objection to "Administrative Record" Recently Supplied By Defendant.  In the Plan, ¶ 8.1, disability benefits incur to a "Participant" who has completed 15 Years of Service.  Mr. Bard therefore qualifies, even after he was no longer employed.

b.   Defendant states that because the Mr. Bard worked up until his date of discharge for failing a drug test, and he was terminated for failing the drug test, "*he simply could not have been* totally and permanently disabled while employed."

The conclusion of the Trustees reflects their failure to appreciate the medical opinions that were before them.

Mr. Bard's disability is *not a physical disability*; it is a *mental disability*.  His disability is not necessarily manifested in a physical sense.  He should not be required to physically get into an accident and/or seriously injure himself or someone, in order for him to qualify and be recognized as having a disability.  In a sense, he was specifically recognized by his employer as having a *mental disability* when he was terminated, as he was *forever barred* from being able to work in the industry he knew, as a longshoremen. (See Letter of termination dated July 23, 2001, P.A.R. 58).   By failing to rely upon doctor's letters in making their decision on Mr. Bard's disability, the Trustees deviated from prior precedent and practice.  See P.A.R. 41 ("…the Fund has historically relied on

doctor's letters in making decisions on disability applications…").  Finally, while Mr.

Bard generally objects to Defendant's use of materials created and submitted after August

25, 2004, calling it the "Supplemental Administrative Record" in his Memorandum, the

Umpire's ("Arbitrator's") Decision dated March 4, 2005 states that on July 16, 2001, one

week before his termination, Mr. Bard "was operating MGM #5 when it was involved in

a collision with a truck.  Bard was subjected to a drug and alcohol screen, and tested

positive.  Thus by letter dated July 23, 2001, Bard was discharged and permanently

terminated from the industry.  Neither Bard nor the ILA filed a grievance contesting his

discharge."  A.R. 000121.   According to this evidence, as well as other evidence in the

Administrative Record, Mr. Bard's performance was in question by both his union and

his employer, and within a week after his crane accident, he was terminated.

    c.  Defendant states that the medical records are inconsistent and contradictory.

    The three medical opinions all consistently reflect that Mr. Bard became totally and

permanently disabled while he was still employed.    The Social Security Administration

also found that Mr. Bard was disabled while still employed, and awarded retroactive

benefits to the date of Mr. Bard's last day of employment.   While one or more doctors

may have used a reference point by using the word "since" (e.g. "since" last December

Mr. Bard has been in my care and/or disabled), or stated that Mr. Bard was "disabled as

of a particular date", and the reference point may have been after a point where Mr. Bard

was already disabled, such use of a reference point *does not mean* that Mr. Bard was not

disabled, before the particular reference point.  Nor would such reference dates change

the conclusions of the medical evidence submitted by three doctors:  that Mr. Bard was

disabled while still employed.  Finally, the Boston Shipping Association's prescribed

medical health care professionals, Lawless & Company, questioned Mr. Bard's disability

as far back as March, 2000.  Mr. Bard's disability, as of that date, was confirmed later.

Thus, the medical opinions are consistent and not contradictory.

     2.  Plaintiff's Response to Defendant Four Major Legal Arguments
        As Set Forth In Defendant's Memorandum of Law.

    In the main body of his Memorandum, Defendant sets forth his four main legal

arguments.  Plaintiff addresses each in turn below.


     a.  Defendant states that the "Arbitrary and Capricious Standard is the
        Proper Standard of Review; Plaintiff Argues While Defendant
        Is Generally Correct,  This Court May Adopt a De Novo Standard In This Case

    The applicable standard would be, as the Defendant's state, the "arbitrary and

capricious" standard where the trustees have full discretion.  Here, the trustees have

discretion, but this discretion is limited by Article VIII, the article that provides for the

award of disability benefits.   According to Article VIII, the Trustees decision on

disability benefits must be "based upon competent medical evidence."

    Further, and according to the position outlined in Defendant's Answer to Plaintiff's

complaint, and as indicated in Defendant's recent filings, the Trustees never made a

decision by February, 2004 on Mr. Bard's appeal of his claim for disability benefits, nor

on August 26, 2004 or 45 days thereafter, after request for reconsideration by Mr. Bard.

Thus, Mr. Bard requests that the Court make a decision on the basis of the Administrative

Record as it existed on August 26, 2004 (or 45 days thereafter).   The medical evidence in

the Administrative Record consists of opinions from three different doctors (two medical

doctors and one Ph.D.), a Social Security Administration finding, and prior reports of

health care professionals engaged by Mr. Bard's employer.  These prior health care professionals' reports question Mr. Bard's disability during March, 2000, when Mr. Bard exhibited symptoms of his mental disability, and Mr. Bard's disability at this earlier date is later confirmed by Dr. Chakrabarti, M.D.   All reports reflect that Mr. Bard became "totally and permanently disabled" while Mr. Bard was still an employee of the Boston Shipping Association.

And because the Trustees never made a timely decision with all of this medical evidence in hand, this Court can review the record utilizing a *de novo* standard of review. See Cecilia Nichols v. The Prudential Insurance Company of America, No. 04-1445-cv (Fed. 2nd Cir. April 21, 2005)(2nd Cir. 2005)(after the expiration of time period without the Plan having made a decision, the case was reviewed under *de novo* standard of review) at 18;  See Also, Jebian v. Hewlett-Packard Co. Employee Benefits Organization Income Protection Plan, No. 00-56988 (9th Cir.  11/25/2003)(9th Cir. 2003)(after the expiration of the deemed time period without the Plan having made a decision, claim was deemed denied (applying 1977 CFR regulations), and case was reviewed under *de novo* standard of review).   According to the Summary Plan Description, Mr. Bard is allowed to presume a denial if the Board of Trustees fail to take action within the time required by the Plan provisions.  See Summary Plan Description sections discussed in Mr. Bard's Objection to the "Administrative Record" Supplied By Defendant.  With presumption of a denial of benefits, the Court could decide the case applying a *de novo* standard.  See Cecilia Nichols, Id.

b. Plaintiff Maintains That Plaintiff, Not Defendant, is Entitled To Judgment As A Matter of Law Under An Arbitrary and Capricious Standard.

    1.  The Parties Have Each Requested Judgment As a Matter of Law;
        Neither Has Requested a Remand.

Rather than remand this case if this Court finds that Defendant has made an improper decision under the arbitrary and capricious standard, this Court is asked to decide this case, as both parties have requested in their respective motions and memorandums, that this Court enter a judgment on the record before them.  See Cook v. Liberty Life Assurance Co., 320 F. 3d 11, 24 (1st Cir.  2003).  According to the First Circuit in Cook, Id. "once a court finds that an administrator has acted arbitrarily and capriciously, the court can either remand the case to the administrator for a renewed evaluation of the claimant's case, or it can award a retroactive reinstatement of benefits." Id. at 24.  This Court may award judgment retroactively, whether the relevant standard of review applied is one of *de novo* or arbitrary and capricious.  See e.g. Radford Trust v. First Unum Life Insurance Company of America, CITE.

    2.  Trustees' Act Ultra Vires And Ignore Treating Physicians'
        Medical Opinions That Say Mr. Was Disabled While Working.

Defendant maintains in his recent filings that while Mr. Bard may be totally and permanently disabled today, he was not during his last day of employment "because he worked up to the date of his drug test and discharge."  Further, he says the medical documentation does not support this conclusion.

    A.  Trustees' Reasoning in Administrative Record Fails;
        Absence of Reliance on Competent Medical Evidence.

First, Mr. Bard points out that the Administrative Record does not contain minutes indicating the reasoning of the Trustees' late decision of April 28, 2004 other than the

letter sent to Mr. Bard on April 28, 2004 which states: "Pursuant to Article VIII

(Disability benefits), sec. 8.1 the Board of Trustees, in its sole judgment, found that the

applicant, Mr. Paul Bard, was not totally and permanently disabled prior to his

termination." See BSA- ILA Plan Letter dated April 28, 2005, A.R. 000129. Absent

from the Trustees' decision is their judgment "based upon competent medical evidence."

The standard is not, as the Trustees improperly state, "*the Trustees' sole* judgment." The

Trustees deviate from their prior precedent and practice of relying upon medical

evidence, and therefore their decision is arbitrary and capricious. See P.A.R. 41 ("…the

Fund has historically relied on doctor's letters in making decisions on disability

applications…")(Originally omitted from Defendant's version of Administrative Record;

Defendant now consents to inclusion).

        B.  Trustees' Reliance on Performance, Personal Observations and
           <u>Hearsay, And Matters Outside Administrative Record, is Misplaced</u>.

      Second, Mr. Bard points out that the Defendant now admits that the Trustees based

their decision on Mr. Bard's perceived "performance record." Mr. Bard's performance

record is not part of this case, nor part of the Administrative Record. The Trustees are

not permitted to base their decision of Mr. Bard's disability on their perceptions or

personal observations. Nor can they base their decision on hearsay. Nor can they base it

on politics. Nor can they base it on their respective entities' financial interest. According

to the Plan, they must base their decision "upon competent medical evidence." They do

not have the right to ignore the three doctors' opinions, the Social Security

Administration's findings of Mr. Bard's disability while still employed, together with

their own health care specialist reports' in the Administrative Record recording Mr.

Bard's symptoms and questioning Mr. Bard's disability as early as March, 2000. Further, while it is not part of the Administrative Record if this Court adopts Plaintiff's view as to the scope of the Administrative Record, the tie-breaking statement and vote of the umpire, appointed under ¶ 13.1 of the Plan solely to break a tie vote of the Trustees, reflects an admission by the employer, Union and Plan that Mr. Bard was not free of performance issues:   "**ON JULY 16, 2001, BARD WAS OPERATING MGM#5 WHEN IT WAS INVOLVED IN A COLLISION WITH A TRUCK**.  **BARD WAS SUBJECTED TO A DRUG AND ALCOHOL SCREEN, AND TESTED POSITIVE.   THUS, BY LETTER DATED JULY 23, 2001, BARD WAS <u>DISCHARGED AND PERMANENTLY TERMINATED FROM THE INDUSTRY</u>." (SEE A.R. 00121 OF DEFENDANT'S ADMINISTRATIVE RECORD).**   This accident was one week before Mr. Bard was discharged.  Thus, Mr. Bard was not free of performance issues as the Trustees seem to believe, apparently on hearsay information.  Further, while Mr. Bard may have been operating a crane until he was terminated, he would not have been operating it safely -- and would have been operating it at great risk to himself and others -- according to the evidence that is part of the Administrative Record.  Otherwise, Mr. Bard should not be expected to be in a major accident with harm to himself or others in order to prove his disability.

        C.  Trustees' Failure To Provide Feedback on
           <u>Mr. Bard's Evidence And Mr. Bard's Inability to Respond.</u>

Third, the Trustees did not give Mr. Bard the opportunity to overcome any objections that the Board of Trustees had in originally denying his application in October, 2003, because, contrary to what is required in the Department of Labor regulations, they never gave him a specific reference to plan provisions on which his denial of benefits was based, nor a description of any material information necessary for him to counter any objections that they may have raised.  See Department of Labor regulations (See Plaintiff's Motion and Memorandum of Law).

D.  Trustees' Late and Misplaced Focus on Justification For Termination
    Rather Than Mr. Bard's Inherent Disabled Condition.

Fourth, Defendant states that Mr. Bard was not totally and permanently disabled because he worked up to the date of his discharge, and that he was discharged for failing a drug test, not because he had performance issues.  He cites the Sullivan v. Neiman Marcus Group, Inc., 358 F. 2d 110 (1st Cir. 2004), claiming that the First Circuit ruled that an employee who had worked up until the date of his termination could not claim to be "disabled" (because he was an alcoholic) within the meaning of the Americans With Disabilities Act, even though he was terminated for the use of alcohol.

In Sullivan, Id., Mr. Sullivan had his job as a salesperson for approximately 6 months before he was fired for drinking on the job.  An argument developed as to whether he was terminated on grounds of misconduct – drinking on the job – versus being "an alcoholic."   Mr. Sullivan worked successfully both before and after his termination.  The Court found a lack of evidence on the record to establish Mr. Sullivan's disability, and without such, did not find an ADA violation.

As in other ADA wrongful termination cases, in Sullivan, the underlying question was whether the employer, Neiman Marcus, had justification to discharge its employee, Mr. Sullivan.  A major objective of the Americans with Disability Act ("ADA") is to prevent an employer from discriminating against an employee because of that employee's disability or perceived disability.   The ADA protects persons who are qualified to do a job, despite a person's disability, and requires an employer to reasonably accommodate a person when such accommodation will enable the disabled person to perform the job.

The ADA protects against wrongful termination of employment, and the employer's behavior is highly relevant as to the ADA remedies available.

In the case at hand, however, whether Mr. Bard was terminated on the grounds of violating company policy or because he had a disability, is not relevant to his ERISA benefits' claim.    The reason for discharge has no bearing on his entitlement to "disability benefits" under the plan.  The question of disability does not involve the employer's proper or improper conduct in terminating Mr. Bard's employment.  The only question is whether Mr. Bard is inherently disabled "based upon competent medical evidence."

When Mr. Bard was terminated he was totally and permanently disabled, according to medical determinations made after his employment termination, that are themselves obviously based upon information both after and before his termination.   He was determined to be totally and permanently disabled while he was still an employee, and thereafter.  This case is not about the employer's perception of Mr. Bard.  And it is not about improper reliance upon such perceptions, and/or in taking discriminatory actions while he was an employee; rather, it is about whether Mr. Bard, as a Plan "Participant" who became disabled, who just happened to be disabled while he was still employed, and after approximately 30 years' of service with his employer (as a vested Participant), is entitled to plan benefits as a "Participant" in that Plan.

Mr. Bard's position is that the Sullivan case is a *discrimination* case concerned ultimately with the question of whether the employer wrongfully terminated the employee.  In this case, Bard has not sued his employer or the Plan for wrongful termination.  Therefore, the statute in that case, and the case itself, are non-applicable.

(Footnote:  It should be noted that Mr. Bard's exclusive representative, the Union, never

filed a grievance upon Mr. Bard's termination despite that Mr. Bard was terminated not

only from employment, but from working in the entire industry:  "Bard was discharged

and *permanently terminated from the industry.* "  See  Employer's Letter, P.A.R. 58.

Given the March, 2000 Lawless & Company reports in the Administrative Record,

together with the Boston Shipping Association's actions and failures of actions with

respect to Mr. Bard's condition over a period of years, one would question whether Mr.

Bard's termination, one week following his crane accident of July 16, 2001, was based

upon the pretext of violating the Company's drug policy, rather than a recognition of Mr.

Bard's disability.  End Footnote).

    Further, in the <u>Sullivan</u> case, Mr. Sullivan did not have evidence in the court record

that supported his supposed inability to work.  The First Circuit says that Mr. Sullivan:

> …presented virtually no evidence demonstrating that his alcoholism had a
> deleterious effect on his ability to work at Neiman Marcus or elsewhere.  In fact,
> Sullivan presented significant evidence demonstrating that his alcoholism has not
> interfered with his ability to work.  In response to a deposition question, he
> insisted that "I was doing a satisfactory job (at Neiman Marcus) before I went into
> treatment.  I felt I would be a much better employee after going to treatment…I
> believed that I gained some spiritual growth while I was in treatment and I was
> going to take that to help perform my job better."…

This lack of evidence is in stark contrast to Mr. Bard's statements in the Administrative

Record:

> …In July 2003, I was declared mentally disabled and for that I am now
> receiving SSDI.  I would now like to apply for my pension because I am
> unable to function rationally and competently…. Letter in possession
> of Board of Trustees before February, 2004 Trustees' meeting, A.R. 00052.

> …I believe that, since the year 2000, and despite my re-employment at
> Boston Shipping, Inc., until my termination, I have been unable to work
> in any gainful way…I also believe that my health condition has not changed

> since the year 2000…and I do not know if my condition will ever be cured…
> Affidavit of Mr. Bard dated August 13, 2004 and before August, 2004
> Trustees' meeting, A.R. 000102.

And this lack of evidence is in stark contrast to Mr. Bard's medical doctors' letters, for

example treating doctor, Dr.Simone's opinion, stated within the BSA-ILA Trust Fund

application for disability benefits' form format:

> Is patient now totally and permanently disabled from his regular occupation?
> "Yes."    BSA-ILA Trust Fund form dated January 23, 2004, and in
> possession of Trustees' before February, 2004 Trustees' meeting A.R. 00053.

And this lack of evidence is in stark contrast to Mr. Bard's treating physician, Elliott

Segal, M.D.'s opinion:

> I treated Mr. Bard from October 2, 2001 to March 4, 2002 at the Bedford
> Veteran's Hospital. In my opinion Mr. Bard was totally and permanently
> Disabled from his regular occupation prior to his employment termination
> on July 23, 2001.

And it is in stark contrast to Dr. Chakabarti's opinion:

> The patient is permanently and totally disabled at this time.
> Letter dated June 23, 2004, A.R. 000096.

And the Social Security Administration, after application of multiple criteria within 20

C.F.R. Section 404, et. seq. found that Mr. Bard was disabled retroactive to July 22,

2001. See A.R. 000098.

Further, unlike Mr. Sullivan, Mr. Bard has sufficient evidence in the administrative

record to establish a disability under the ADA's definitions, as he would only have to

show one of the following, even though he would likely be able to establish all three:  (a)

a physical or mental impairment that substantially limits one or more of the major life

activities of any individual (b) a record of such an impairment (c) being regarded as

having such an impairment.  42 U.S.C. 12102(2).   Based upon "competent medical

evidence" in the Administrative Record, Mr. Bard is "totally and permanently disabled".

While Mr. Bard is most likely disabled for purposes of the ADA, it would actually be

unnecessary for Mr. Bard to show such disability, because he has shown such under the

Plan's criteria: "competent medical evidence," which the Trustees ignored.   No evidence

refutes the medical determinations that are existing in the Administrative Record, nor had

the Trustees' critiqued such determinations with such criticisms having become part of

that record.

   Further, in their minutes of  February 25, 2004, the Trustees admit that "**THE**

**FUND HAS HISTORICALLY RELIED ON DOCTOR'S LETTERS LETTERS IN**

**MAKING DECISIONS ON DISABLTY APPLICATIONS**."    See P.A.R. 41.

(Originally eliminated from Defendant's Administrative Record; Defendant now consents

to their inclusion).   The Administrative Record clearly reflects that they rendered an

opinion without this medical evidence.   In this case, the Trustees **improperly deviated**

**from this prior practice and precedent, making their decision arbitrary and**

**capricious**.   See P.A.R. 41.


         E.  Trustees' Late Substitution of Opinion, and
             <u>Failure to Recognize Medical Expert's Opinions</u>.

             1.  No Inconsistency Just Because Of the Word "Since";
                 <u>Medical Opinions Remain Uncontested</u>.

   Despite what Defendants' attorneys now argue for the first time in Court, all of

Mr. Bard's medical opinions are consistent.   The fact that Mr. Bard's disability was in

existence "since" a certain date, does not preclude its existence before such date.   Dr.

Elliott Segal, M.D., a treating physician at the Veterans Administration Hospital, opined

that Mr. Bard was disabled while still employed (July 22, 2001).  See A.R. 00095.  He

does not change this date.  This opinion by itself substantiates Mr. Bard's claim, as no evidence exists to counter it.

Moreover, Dr. Chakrabarti writes a letter that states that Mr. Bard was disabled "since" December, 2001, and in an updated letter, places the onset date of disability to March 21, 2000.  The Social Security Administration found disability since July 21, 2001, Mr. Bard's last day of employment.   If Mr. Bard was disabled on March 21, 2000, he was disabled "since" that date, and "since" every other date that follows that date.

Mr. Bard, however, seeks relief from only the last date of his employment, July 23, 2001, even though he has been determined to be disabled as of March 21, 2000.

It is true that the treating physicians' medical opinions and the Social Security Administration's finding that Mr. Bard relies upon, are opinions that were rendered after Mr. Bard's last day of employment.   But they opine on Mr. Bard's condition not only as of the date of assessment, but on his condition prior to the date of assessment.   Only a medical doctor, not a plan Trustee, can determine whether Mr. Bard became disabled and when.   In this case, Mr. Bard's *treating* doctors rendered the opinions that establish his disability while still employed.

### 2. A Diagnosis By a Medical Doctor of a Previous Condition, While Non-Contemporaneously Made, Is Proper Evidence.

Mr. Bard did not visit a medical doctor just prior to being terminated, and therefore, does not have a contemporaneous medical expert determination, made while he was still employed, that he was totally and permanently disabled.   But the uncontroverted medical evidence by his treating physicians, based upon a diagnosis that occurred post employment, declares that he was disabled while still employed. Defendant disagrees, based on the case of <u>Blickenstaff v. R.R. Donnelley & Sons Co.</u>

Short Term Disability Plan, 378 F. 2d 669 (7th Cir.  2004).   Defendant cites such case for the proposition that the "plan did not act arbitrarily and capriciously when it refused to consider post-denial diagnoses from medical providers."

But the medical evidence in that case is not the same as the medical evidence in this case.    In Blickenstaff, Id., after the claim was already denied by the plan, the claimant obtained two different medical opinions from non-treating physicians to bolster the claimant's claim, after the plan's denial of his claim.  The plan did not consider the new information obtained from the doctor because the new report represented the claimant's condition on the date of the exam, May 18, 1999, but did not address the claimant's condition of the date of the eligibility determination, March 14, 1999.  *The claimant, **herself**, insisted that the opinions were relevant to her condition on the prior date, March 14, 1999, even though the medical opinions themselves did not concern themselves at all with that prior date.*

The medical opinions that Mr. Bard relies upon, on the other hand, as well as the Social Security Administration findings, ***are opinions that address Mr. Bard's condition while still employed***, in addition to his current condition.  Further, unlike the medical opinions in Blickenstaff, the opinions that Mr. Bard relies upon are from ***treating physicians***, not non-treating physicians.   Moreover, unlike this case where no objections to Mr. Bard's evidence appear in the administrative record, the plan's objections in that case were made ***on the administrative record***.   Here the Plan's attorneys are attempting to attack Mr. Bard's medical opinions for the first time in Court.

Moreover, *this Court has aleady adopted the use of non-contemporaneous medical opinions* that opine on the claimant's condition of disability while the claimant was previously employed.  See Radford Trust v. First Unum Life Insurance Company, 321 F. Supp. 2d 226 (2004).  In the Radford case, this Court states:

> …The availability of benefits under the Policy cannot turn on the accident of whether the insured was fortunate enough to get to see a doctor before employment terminated.  Id. at 245.
> …given that employment termination is more likely to occur swiftly after the onset of a major disability than after the onset of a minor one, First Unum's interpretation would make the most severely disabled the least likely to receive coverage.  These are precisely the people the Policy was most designed to protect…Id. at 245.
> …First Unum tried to trap Doe in a Catch-22, arguing that *because* ***Doe maintained that he continued to work full time through at least May 21, 1999, he could not have been "disabled" during that period*.  *This was pure sophistry*…Id at. 246. (emphasis supplied).
> …Under First Unum's argument, a schizophrenic employee could not become "disabled" until the moment he stopped working.  Of course, if he had not yet seen a doctor regarding his condition, **First Unum believed that he would become forever ineligible for benefits the moment he stopped working. *This could not possibly be the correct interpretation of the Policy.*"** Id. at 247.   (emphasis supplied).

Thus, this Court allows the use of non-contemporaneous medical opinions that opine on a claimant's prior condition of disability.

A review of the above analysis reflects that this Court recognizes that the date of diagnosability of a disease may precede the date of actual diagnosis.  The claimant's benefits should not depend on the fortuity of whether the claimant was diagnosed at a random point in time -- post employment.   This would be especially true if the ultimate declaration is that the claimant was totally and permanently disabled because of mental disability.

Mr. Bard relies upon the medical evidence to establish his existing disability while still employed, whether such disability was recognized by others or not. The use of non-contemporaneous medical opinions does not vitiate the existence of Mr. Bard's disability. It's the only way that Mr. Bard can prove the onset date of his disability. The fact that the opinions were rendered by Mr. Bard's *treating* physicians lends credibility to them.

For the above reasons, the Trustees cannot reasonably dismiss three doctors' opinions admittedly made post-employment, but that opine on Mr. Bard's condition while still employed, plus a Social Security Administration opinion that was made on a retroactive basis, plus the evidence of its own prescribed mental health counselors' (Lawless & Company's), who the Boston Shipping Association directed Mr.Bard to visit as a condition of returning to employment, and who recorded Mr. Bard's symptoms and questioned the mental disability of Mr. Bard as early as March, 2000 (confirmed by Dr. Chakabarti, M.D. to have present on that early date). The Administrative Record is clear.

3. Trustees' Failure to Recognize Opinions
   and Failure to Obtain Expert Opinions on Their Own.

The Board of Trustees do not have the choice to ignore the medical evidence in this case, as their decision must be based upon "competent medical evidence." No one has asserted that the doctors who have opined in this case are incompetent. Nor did the Trustees hire a medical professional of their own, whose opinion contradicts those of Mr. Bard's medical doctors. See Plaintiff's Motion and Memorandum.

4. Trustees' Failure to Recognize Lawless & Company's
Recognition of Symptoms and Inquiries Indicative of
<u>Mr. Bard's Disability As of March, 2000</u>.

The Defendants state that when Mr. Bard was required by his employer in March,

2000, to attend three visits with Lawless & Company, who Defendant describes as a

mental health counselor, Ms. Lawless states "exit diagnosis still unclear."  Defendant

states that this evidence does not support Plaintiff's claim that he was totally and

permanently disabled while still employed.

But on March 7, 2000 Ms. Lawless questioned whether Mr. Bard had "Anxiety

Disorder, Impulse Disorder, Substance Abuse (Dual Diagnosis), and/or some form of

Mood Disorder."  On March 14, 2000 she states that "He appears to have some

compulsive problems with behaviors and is aware at the time he is doing them that they

are odd."  She questions "Obsessive Compulsive Disorder."  On March 21, 2000, Ms.

Lawless discusses the pursuit of "individual psychotherapy and other community support

programs."  She declares that "Exit diagnosis is still unclear" BUT she says that she is

"GATHERING MORE DATA TO EXPLORE PSCHOPHARM INTERVENTION."

This medical evidence in the Administrative Record is consistent with Mr. Bard's

condition of disability as early as March, 2000.   Dr. Chakabarti, M.D. opines, on a

retroactive basis that Mr. Bard was disabled as of that date.   As a matter of law, the

Trustees cannot ignore this medical evidence that is contained in the Administrative

Record, but the record indicates that none of the medical evidence – as opposed to

personal observations, perceptions and hearsay – was relied upon.

5. The Trustees Improperly Dismiss Mr. Bard's Own
<u>Statement of Disability Received February, 2004</u>.

The Defendant dismisses Plaintiff's own statement that they had in their Administrative Record, which is circulated by fax from the Boston Shipping Company to Counsel of BSA-ILA on February 23, 2004, where Mr. Bard states "In July 2003, I was declared mentally disabled and for that I am no receiving SSDI.  I would now like to apply for my pension because  I AM UNABLE TO FUNCTION RATIONALLY AND COMPETENTLY.  Kindly respond as soon as possible."  This evidence is in the BSA-ILA pension's custody before the February 25, 2004 meeting (See Plaintiff's version of the Administrative Record, "P.A.R.", page 40 – Defendant in his latest filing does not contest that this document is part of the Administrative Record.).

6.  Plan Attorneys' Late Criticisms of the Medical Evidence;
   Precedence and "Competent Medical Evidence Standard"

Defendant states that Dr. Segal's opinion does not indicate details about what Plaintiff did for a living.  But Dr. Segal's written opinion contains a conclusion; Mr. Bard's extensive medical records, while not made part of the Administrative Record nor requested as part of the Plan's administrative process, would likely provide the details that Defendants attorneys, at this late stage, now seek.   Similarly, the Social Security Administration determination that Mr. Bard was disabled as of July 21, 2001, while he was still employed, is a conclusion based upon a record.  It is not Mr. Bard's fault that the Board of Trustees did not develop a more comprehensive, medically evidenced, administrative record.

Defendant states that "just because a medical provider opines that a person is totally and permanently disabled does not mean that the same individual is totally and permanently disabled within the meaning of the Plan."   But the Plan, as a matter of

precedence and practice, has historically based its decisions on doctor's letters ("…the Fund has historically relied on doctor's letters in making decisions on disability applications…"), P.A.R. 41.  To change its criteria at this late moment, when it has a financial, a political, or other interest to promote, and deviate from precedence and practice, is action that is "arbitrary and capricious."

The Plan does not provide a definition of "total and permanent" disability.  It however, directs the Trustees to decide Mr. Bard's entitlement "BASED UPON COMPETENT MEDICAL EVIDENCE."  The opinions of Mr. Bard's treating physicians, three of them -- two medical doctors and one Ph.D. -- are the evidence relied upon to show that Mr. Bard's was totally and permanently disabled while still an employee of Boston Shipping Association, and going forward.    The Trustees cannot ignore the medical evidence contained in the Administrative Record.

### F.   Defendant's Justification For Denial On the Record Is Not Proper.

Defendant concludes that "there are enough inconsistencies, contradictions and changed views, in the statements of the Plaintiff and the Plaintiff's medical providers to raise a fair question of their legitimacy as to the issue of whether or not the Plaintiff was totally and permanently disabled as a crane operator as of July , 2000…"

But there are NO inconsistencies in the Administrative Record that exist.  And the ONLY competent medical evidence that exists in the Administrative Record is provided by the employer's own mental health care professional during March, 2000, which indicates Mr. Bard's symptoms and questions his disability as of that date (See Lawless & Company's report) later confirmed by Dr. Chakabarti's determination on a retroactive basis, and conclusions by Mr. Bard's treating physicians, all of whom opine that Mr.

Bard was disabled while still employed:  See. e.g. "I TREATED MR. BARD FROM

OCTOBER 2, 2001 TO MARCH 4, 2002 AT THE BEDFORD VETERANS

HOSPITAL.  IN MY OPINION, MY BARD WAS TOTALLY AND PERMANENTLY

DISABLED FROM HIS REGULAR OCCUPATION PRIOR TO HIS EMPLOYMENT

TERMINATION ON JULY 23, 2001."  See Letter of Elliott Segal, M.D., A.R. 000095.

   c. Defendant's States that Even Under A DeNovo Standard of Review, The Defendant Is Entitled To Judgment As A Matter of Law; Plaintiff Argues That Under A *De Novo* Standard of Review, Mr. Bard Is Entitled To Judgment As a Matter of Law.

The Defendant states that he is entitled to judgment as a matter of law even under a

*de novo* standard of review.  Again, neither party asks for a remand to the administrative

process at the Plan level.  Plaintiff relies upon all the arguments above in support of its

opposite position, that Plaintiff, rather than Defendant, is entitled to judgment of matter

of law applying this standard.

   d. Defendant States That The Onset of Total and Permanent Disability Must Have Occurred While Mr. Bard Was Still Employed; Plaintiff States That the Plan Provides Disability Benefits to "Participants" Whom Become Disabled After 15 Years of Services, Regardless of Whether Still Employed.

     1. The Plan's Language is Clear and Unambiguous: A Participant Is Entitled to Disability Benefits After Vesting of 15 Years of Service.

 Defendant now states that the onset of the total and permanent disability must have

occurred while Mr. Bard was employed.  But Mr. Bard's position is that the Plan's

language is clear and unambiguous:  he did not need to be "totally and permanently

disabled" *while still employed*.  In this case Mr. Bard incurred his disability while still

employed, but the Plan does not require such.  The Plan requires that he be a

"Participant" with 15 Years of Service when he becomes totally and permanently

disabled (See The Plan, ¶ 8.1).  A "Participant" is an employee who *has met* the

requirements of eligibility to participate in the Plan (See The Plan, ¶ 3.22).    As an employee for approximately 30 years, Mr. Bard had already met the 15 Years of Service requirement needed to qualify for disability benefits under ¶ 8.1 of the Plan at the time he was terminated.  While the Trustees do have discretion, they cannot rewrite the Plan. Once Mr. Bard is a "Participant" in the Plan, he is always a "Participant"; this status cannot be taken away from him (see e.g. the Summary Plan Description describes the benefits, including disability benefits, applicable to "members" not "employees" in the plan).  See discussion in Mr. Bard's Objection to the Recently Supplied "Administrative Record" by Defendant:  *Defendant originally eliminated the Summary Plan Description from its version of the Administrative Record but now consents to its inclusion*.

And ERISA defines "participant" as "any employee or former employee of an employer…who is or may become eligible to receive a benefit of any type from an employee benefit plan…or whose beneficiaries may be eligible to receive any such benefits."  29 U.S.C. Section 1002(7).   The term "participant" has the same meaning under all sections of ERISA.  Heimann v. National Elevator Industrial Pension Fund, 187 F. 2d 493, 504 (5th Cir. 1999)(overruled on other grounds).  A plan participant should be able to rely upon ERISA's definition in assessing his rights, at least if the Plan does not clearly exclude former employees as "Participants".

As stated, the words of the BSA-ILA Plan are plain and unambiguous. According to Paragraph 3.22 of the Plan, "Participant" shall mean an Employee *who has met* the requirements of eligibility to participate in the Plan (emphasis supplied).  This would include both employees and former employees.   According to 3.12 of the Plan, "Employee" shall mean (a) each individual who ***now, or hereafter is*** employed as a

Longshoreman…(emphasis supplied).   The Plan as restated was adopted on September 27, 1978, and at that time, Mr. Bard had been an employee for approximately 4 years, and thereafter, he was continually employed for another approximately 26 years.   Thus, he was an "employee" *now* … employed *when the Plan was adopted*, and thereafter – for the next 26 years.   According to Paragraph 5.1 of the Plan, an employee becomes eligible for participation on his Entry Date.   Thus, Mr. Bard was a Participant in the plan since the Plan's adoption, and has remained a Participant ever since.

Further, the BSA-ILA Plan admits that Mr. Bard is a Participant in the Plan in its Answer to the complaint.   In Paragraph 8 of the complaint, Paul Bard alleges:   "Paul Bard was a Participant in the BSA-ILA Plan for at least 30 years."   The BSA-ILA's Answer is "Admit."   See BSA-ILA Pension Plan's Answer to Complaint, ¶ 8.

The Plan also admits that he is *still* a Participant:   Mr. Bard alleges that "On April 20, 2005, the date of Plaintiff's Amended Complaint, Paul Bard was still a Participant in the BSA-ILA Pension Plan ." The BSA-ILA's Answer is "Admit."   See BSA-ILA Pension Plan's Answer to Complaint, ¶ 17.

And according to the BSA-ILA Pension Plan itself, Mr. Bard is a "vested" Participant in the BSA-ILA Pension Plan.   See A.R. 00069.

The Plan specifically refers to several types of Participants in the Plan, and each one is entitled to their respective rights of benefits:   "terminated Participant" (See ¶ 9.1 of the Plan:   those no longer employed), "retired Participant" (See ¶ 9.4 of the Plan:   those no longer employed but retired), "Any participant" (See ¶ 13.11)(open term); a "disabled Participant" (See ¶ 8.2:   those no longer employed because of disability); The Plan provides for allocations of benefits "for a Participant whose employment terminated…"

(See e.g. Article XVII, ¶¶ 17.2(b) and 17.2(c))(those no longer employed);  according to the Plan's language, these persons with different statuses are still all considered "Participants."

  The Summary Plan Description booklet applies to "members" of the BSA-ILA Plan ("As a member of the Boston Shipping Association-International Longshoremen's Association Pension Plan, you have a head start…", see page 4); See P.A.R. 6.

  Defendant characterizes *this* as a "late-raised issue by the Plaintiff."  Plaintiff is uncertain as to what Defendant means.  This is *Defendant's first opposition* to Plaintiff's original motion.  First Plaintiff filed a verified complaint; Defendant filed an answer, Plaintiff filed a Motion For Judgment On the Pleadings And/Or Case Stated, And/Or Motion For Summary Judgment together with its proposed Administrative Record and Supplemental Administrative Record, and after Defendant objected and submitted its own version of the Administrative Record that it thought applicable, Plaintiff filed its objection to that "Administrative Record," and refiled his originally filed Motion as a "renewed motion."

  Defendant then states that "the answer ignored by Plaintiff is very simple." He refers to ¶ 9.1 of the Plan.   Defendant has not raised the plan provision, ¶ 9.l, as a basis for denial of benefits anywhere in the Administrative Record.   It is not raised in the Minutes of the Board of Trustees, nor even in the ultimate letter of denial by the Plan during April, 2005.   Yet the Plan appears to rest its argument that Mr. Bard must be an employee at the time his disability is incurred on this provision.   The Plan's attorneys raise it for the first time since the time Mr. Bard applied for benefits, October, 2003, contrary to the requirements of the Department of Labor Regulations requiring that any

denial of benefits during the administrative process be based upon a cite to the relevant

language of the Plan. (See Plaintiff's Motion and Memorandum).

But ¶ 9.1(b) construed literally, does not preclude, but rather, entitles Mr. Bard to his

benefits, because Mr. Bard has approximately 30 Years of Service with his employer, and

¶ 9.1 only excludes Participants with less than 10 Years of Service from obtaining

benefits.  See ¶ 9.1 (c) of the Plan.  ¶ 9.1(c) provides:

> 9.1 (c)  If a Participant has been credited with *less than* ten (10) Years of
> Vesting Service <u>at his termination of employment</u>, ***he shall not be entitled
> to <u>any</u> benefit under the Plan***.  See P.A.R. page 22:  the Plan was amended
> thereafter, and appears as A.R. page 00024. (before amendment – emphasis
> supplied; the amendment has no effect on this interpretation).

Because Mr. Bard has in excess of 10 Years of Vesting Service upon his termination, he

is not precluded by ¶ 9.1 from receiving ***any of the benefits*** that he would otherwise be

entitled to receive under the Plan.    Thus, he would not be precluded from receiving

disability benefits under ¶ 8.1 (¶ 8.1 provides in part: "In the event that a Participant who

has completed fifteen (15) Years of Services becomes totally and permanently disabled,

***he shall be entitled to a disability benefit***…").  This is because, as a Participant who

becomes totally and permanently disabled, he had over, not less than, 10 Years of

Vesting Service at his termination of employment.

Should any other construction be possible, Article VIII specifically addresses, and

supercedes Article IX, with respect to disability benefits.  In any event, ¶ 9.1 clearly does

not take away the benefits that are given to Mr. Bard by ¶ 8.1, because Mr. Bard has *in*

*excess of* 10 Years of Service.

Even if Plaintiff were incorrect in his analysis as to whether he *needed to be* an employee at the time of onset, he would be entitled to the disability benefits in question because he *actually was* disabled while still employed.

> 2.  The Defendant Misconstrues The Administrative Record, the Definition Of Umpire, And What It Means To Cast A Deciding Vote.

The Defendant states that an arbitrator has the final say on Trustee deadlocks, and on the issue of whether the Plaintiff had to be an employee when he became totally and permanently disabled.   Because the Plan's language is clear and unambiguous, its language cannot be trumped by administrative process.   Further, Mr. Bard's vested rights under the ERISA plan cannot be stripped by Trustees who obtain financial gain to their respective entities by denial of his claim, and who were his original advisors as to how to proceed on his claim.

Defendant maintains in his Answer to this lawsuit that a deadlock vote during February, 2004 has kept the Plan from making a decision on Mr. Bard's benefits.  ¶ 13.1 of the Plan provides that the Board may appoint an *umpire* to "cast the deciding vote on such questions."  (See A.R. 000028).  After Mr. Bard filed this lawsuit  -- because the Trustees failed to award Mr. Bard disability benefits on an Administrative Record composed of competent medical evidence in Mr. Bard's favor -- the Trustees decided to appoint an "arbitrator" as an "umpire" to "cast the deciding vote" on its deadlock.  Its issue was whether Mr. Bard was "even eligible to apply for disability benefits as a terminated employee," and was not based upon any disclosed provision of the plan.   Mr. Bard specifically reserved his rights, and refused to waive his rights away, to have an arbitrator decide his fate, and originally brought a motion for temporary restraining order

in this Court to preclude the Plan from entertaining a binding, non-contestable,

procedure. (See Court Docket: Plaintiff's Motion For Temporary Restraining Order).

The Plan agreed that Mr. Bard's rights were not being waived, and agreed that any

decision from the Plan was not binding on Mr. Bard insofar as his rights to appeal

process in the federal court were involved. A.R. 000116.   Mr. Bard had no longer been

represented by the Union after his termination date, and being ill advised by the Union

previously, did not believe that the Union would represent his interests. The document

generated by the "umpire" called "arbitrator" was during a period that Mr. Bard was

awaiting to see if this lawsuit could be settled. The umpire, as an "arbitrator," then filed

an opinion in which he directed the Board of Trustees to make a decision based upon

whether Mr. Bard was an employee at the time of his onset of disability. A.R. 000128.

While called an arbitrator's opinion, the opinion has no weight other than it provides the

deciding vote, for purposes of ¶ 13.1 of the Plan, on the issue of whether Mr. Bard is

eligible to even apply for disability benefits. The casting of this "vote" certainly cannot

undo the Plan provisions. And the umpire appears to have acted ultra vires by going

beyond the authority granted to him under ¶ 13.1 of the Plan.

Defendant notes that neither management nor the union argues, as Plaintiff, that a

former employee is entitled to a disability pension.

Mr. Bard asks the court to take notice that, given the verified pleadings, Mr. Bard

discontinued Union involvement shortly after his employment termination. Mr. Bard was

forever barred from working again in the industry.  Neither the Union nor the employer

have any reason to protect Mr. Bard; both management and the Union, as well as the

Plan, profit by the Trustees' not paying disability benefits to Mr. Bard.

Finally, it is Mr. Bard's position that, because the Trustees failed to act within its time prescriptions imposed by the Plan itself, as well as the Department of Labor regulations, the Court should decide this case as the evidence existed on the Admininstrative Record as of August 25, 2005 or 45 days later.

e.  The Issue of the Administrative Record.

In light of the Defendant's position, Plaintiff requests the Court grant the relief requested in his motion entitled Plaintiff, Paul Bard's, Objection to the Proposed "Administrative Record" Recently Supplied By Defendant, and Requests For Relief.

The issue of the limitation of the Administrative record to the period of time that was allowed to make decisions by the Plan and the Department of Labor Regulations is addressed in Paul Bard's other motion entitled Renewed Motion For Judgment on the Pleadings And/Or Case Stated And/Or For Summary Judgment, and to a certain extent, herein.

The Defendant argues that it had a right to exceed the time prescriptions of the Plan, and the Department of Labor regulations, on the basis that it had appointed an umpire to decide the issue of whether Mr. Bard was eligible to apply for benefits under the Plan.

Mr. Bard agrees that the Board of Trustees have a right to appoint an umpire under ¶ 13.1 of the Plan.  But nowhere within the Plan is the right given, upon such an appointment, to extend the time limitations built into the Plan and as otherwise imposed by law (the D.O.L. regulations require decisions within 45 days of an appeal).   The Plan took from October 23, 2003 to April, 2005 to decide the preliminary issue of whether Mr. Bard was even eligible to apply for his disability benefits.   At the time, Mr. Bard had already been ill-advised with respect to his options in the past.   See A.R. 00052.  Further,

Mr. Bard was ill-advised by the Union and an employee of the employer that he should not apply for disability benefits under the Plan, without having a Social Security decision declaring disability first. See Uncontested Facts, ¶ 9 (within verified complaint). If the Plan is correct on the issue of having no time restrictions to decide various sub-issues, Mr. Bard, as other Participants in a Plan, would potentially have to await years of preliminary determinations before actually having the right to apply for Plan benefits. That is, the Trustees could require separate findings by an arbitrator on multiple issues, such as eligibility to apply, number of years of service, how to count hours of service, whether Mr. Bard was actually an employee, whether Mr. Bard lost his rights due to being terminated, whether Mr. Bard is entitled to vested service for 30 years or 29 years, whether Massachusetts or federal law applies, for starters. Each issue could be sent to an arbitrator for months, successively, and the Plan could surpass the time limitations imposed by the Department of Labor regulations, indefinitely, without concern. The Plan cannot be allowed to pass time limitations imposed by law by employing sub-issues and sub-procedures on its own.

Thus, Mr. Bard requests that the Court make a decision on the basis of the Administrative Record as it existed on August 26, 2004, or 45 days thereafter, with the medical evidence from three different doctors (two medical doctors and one Ph.D.), and a Social Security Administration finding, medical reports from its health care professionals dated March, 2000 questioning Mr. Bard's disability (later determined to be relevant in declaring Mr. Bard disabled at that earlier time) all that reflect that Mr. Bard became "totally and permanently disabled" while Mr. Bard was still an employee of the Boston Shipping Association.

f.  Conclusion.

For the above reasons, together with the reasons set forth in the Plaintiff's Memorandum attached to its Motion for Judgment on the Pleadings And/Or Case Stated And/Or For Summary Judgment, Plaintiff asks for Judgment in this case.  Plaintiff also requests a ruling on its Objection to the "Admininstrative Record" Recently Supplied By Defendant.

September 21, 2005

<blockquote>
PAUL BARD,
By His Attorney,

/s/ Robert E. Daidone
_____
Robert E. Daidone, Esq.
BBO# 544438
44 School Street
Suite 500
Boston, MA  02108
(617) 722-9310
</blockquote>

## CERTIFICATE OF SERVICE

I, Robert E. Daidone, Esq. hereby certify that I served the above on Defendant's counsel by filing such electronically on the U.S. District Court's system on this 21st day of September, 2005.

<blockquote>
/s/ Robert E. Daidone
_____
Robert E. Daidone, Esq.
</blockquote>