# United States Court of Appeals
## For the First Circuit

No. 06-1810

PAUL BARD,

Plaintiff, Appellant,

v.

BOSTON SHIPPING ASSOCIATION; INTERNATIONAL LONGSHOREMEN'S
ASSOCIATION PENSION PLAN, a/k/a BSA-ILA Pension Plan,
a/k/a BSA-ILA Trust Fund,

Defendants, Appellees.

APPEAL FROM THE UNITED STATES DISTRICT COURT

FOR THE DISTRICT OF MASSACHUSETTS

[Hon. Nathaniel M. Gorton, U.S. District Judge]

Before

Torruella, Circuit Judge,
Cyr, Senior Circuit Judge,
and Lynch, Circuit Judge.

Robert E. Daidone for appellant.
Geoffrey P. Wermuth for appellees.

December 19, 2006

**LYNCH, Circuit Judge.** This is an unusually complex denial of benefits case that arises under the Employee Retirement Income Security Act of 1974 (ERISA), 29 U.S.C. §§ 1001-1461. The defendant is a multi-employer pension plan ("BSA-ILA" or "the Plan"), and at issue is a decision by its Board of Trustees ("the Board") to deny disability benefits to a former employee, Paul Bard. The district court upheld this denial. We reverse and order an award of benefits.

In so doing, we do not reach Bard's invitation to join those circuits holding that a plan's ERISA violations will strip it of the deference its decisions otherwise enjoy. Rather, using a model of analysis previously employed by this circuit, we hold that Bard was prejudiced by the Plan's numerous regulatory violations, and that on the particular facts here he is entitled to the remedy of an award of benefits.

I.

Bard worked as a crane operator on the Boston docks for some 30 years. On July 16, 2001, he was involved in a workplace accident. As Bard had a history of substance abuse and was working under a "last chance agreement," he was subjected to a post-accident drug test. He tested positive. His employment was accordingly terminated on July 23, 2001.

Bard sought medical treatment, and his doctors diagnosed him as suffering from a variety of psychological disorders that

-2-

made him disabled and unable to work.[1]   Before applying for disability benefits from the Plan, Bard applied for Social Security disability benefits on November 26, 2001.  His Social Security claim was initially denied.  However, on May 10, 2003, after a hearing at which Bard presented additional evidence, an ALJ issued a written opinion awarding Bard disability benefits on the basis that Bard had been suffering from a "severe" disability since July 22, 2001 -- one day before Bard received his termination letter.

Armed with this finding, Bard applied for disability benefits from BSA-ILA.  The troubled journey of that application is described below.[2]

A.        The Plan's Structure and Documents

BSA-ILA is a multi-employer employee benefits plan, regulated by ERISA, and governed by a Board of Trustees composed of 14 members.  Seven members are management trustees selected by the Boston Shipping Association, and seven are union trustees selected by the International Longshoremen's Association.  If the trustees

---

[1] It appears from the record that Bard's condition was primarily psychological in nature, and there are references in the record to "severe depression," "anxiety disorder," "bipolar disorder," and "a history of substance abuse."  There are limited references to some physical problems, including psoriasis and psoriatic arthritis.

[2] The administrative record we have been provided is unusually obscured.  To the extent any relevant documents are missing, it was the Plan's responsibility, as keeper of the records, see 29 U.S.C. § 1059(a)(2), to provide those documents.  As we discuss later, a number of required notices are not present in the record.  No party contends that these notices were in fact given.

deadlock on an issue, an "impartial umpire" selected by the trustees will cast the deciding vote. A plan provision declares that "[e]xcept as provided by ERISA, all decisions of the Board, including all those made in the interpretation and administration of the Plan, shall be conclusive, final and binding."

For disability benefits, plan documents state that a claimant is eligible for these benefits if he, or she, is a "Participant who has completed fifteen . . . Years of Service [and] becomes totally and permanently disabled." The Plan also provides that "[t]he Board, upon competent medical evidence, shall be the sole judge of whether a Participant is disabled." The word "Participant" is defined in the Plan to mean "an Employee who has met the requirements of eligibility to participate in the Plan." "Employee" is in turn defined as "each individual who now, or hereafter is employed as a Longshoreman, Clerk, or Linehandler in the industry and is a member of the ILA and for whom an Employer is required to make contributions" to the Plan. Nothing in the Plan's documents explicitly states that an applicant for disability benefits must have become disabled at a time when he was still employed.

The administrative record contains what appears to be the summary plan description (SPD). See 29 U.S.C. § 1022(a) (requiring an ERISA plan to provide information about the plan "written in a manner calculated to be understood by the average plan participant

-4-

and . . . sufficiently accurate and comprehensive to reasonably apprise such participants and beneficiaries of their rights and obligations under the plan"). That SPD states that "[t]o be eligible [for disability benefits] you must: [(1)] Have completed 15 Years of Pension Service at the time you became disabled . . . [and (2)] Demonstrate to the Board by submission on approved forms of competent medical evidence that you are permanently and totally disabled." Nothing in the SPD states that the claimant must have been disabled at a time when he was still employed. The SPD is dated April 1988, and there is no evidence that the Plan ever updated its SPD, or, if so, that any updated description was provided to Bard.

B.      Bard's First Benefits Application

Sometime between August and October of 2003, Bard notified BSA-ILA that he wanted to apply for disability benefits in accordance with the Plan's provisions. Bard's initial letter stated that he had been diagnosed with manic depression, "which the doctor felt was a chronic on going [sic] problem for many years," and that the Social Security Administration had found him mentally disabled. The record does not reveal whether Bard provided any documentation along with this letter.

At its regular meeting on October 29, 2003, the Board determined that Bard was not eligible to apply for a disability pension. The Board's minutes refer to a prior arbitration, dated

July 15, 2002, which had rejected an application for disability benefits from a claimant named Gerard McLaughlin (the "McLaughlin arbitration"). The Board read the McLaughlin arbitration to mean that an individual who was no longer employed was ineligible to even apply for a disability pension. It also apparently interpreted this arbitration to mean that an employee is only eligible for benefits if he became totally and permanently disabled while still employed. We note that the Board had never amended the SPD to reflect these points, and Bard had no prior notice of the Board's reading.

It is also not clear that this was the correct reading. The McLaughlin decision, which is in the record, relied heavily on minutes from a February 1993 Board meeting in which the Board apparently denied a claim from a former employee named Paul Cocchi (the "Cocchi claim") because the "onset" of Cocchi's disabling condition had occurred after Cocchi had left employment. Finding McLaughlin's case indistinguishable from Cocchi's, the arbitrator denied McLaughlin's claim. Importantly, the decision specifically declined to extend itself to a situation where an employee "leaves employment because of the onset of a disabling condition that becomes total and permanent at a later date." This nuance apparently went unnoticed by the Board, and it is unclear if Bard

-6-

was ever given an opportunity to dispute the Board's reading of the McLaughlin arbitration.[3]

C.      The First Denial and Bard's Attempted Review

        The record contains no evidence that the Board's first denial of benefits, or its specific reasons for that denial, were communicated to Bard in writing or by electronic means.  This was in contravention of federal regulations.  See 29 C.F.R. § 2560.503-1(g)(1) (requiring "written or electronic notification" of any initial "adverse benefit determination"); id. § 2560.503-1(g)(1)(i) (requiring that this notification explain the specific reasons on which the determination was based).  By some means, however, Bard learned the outcome of the Board's first decision, although not necessarily its reasoning, as Bard took an administrative appeal in late 2003 to challenge the Board's initial determination.

        The appeal apparently went to the Board because it had failed to provide for an independent appellate body.  This also contravened regulations.  See id. § 2560.503-1(h)(3)(ii), (h)(4) (requiring that an appeal be decided, without any deference to the prior determination, by an appropriate plan fiduciary "who is

_____

[3] There is also no evidence that a copy of the McLaughlin arbitration decision was sent to Bard in conjunction with the initial rejection of his application.  Indeed, it is unclear from the record if Bard was ever given access to the text of the McLaughlin arbitration until after this litigation had commenced. Moreover, the meeting minutes from the Cocchi claim, on which the McLaughlin arbitrator relied, are not in the record at all.

-7-

neither the individual who made the [initial] adverse benefit determination . . . nor the subordinate of such individual"}.

During January 2004, Bard also submitted an application for disability benefits on a BSA-ILA form, along with medical documentation regarding his disability. Some of the documentation stated that Bard was "totally and permanently disabled," but did not date the onset of symptoms or of total disability. However, a letter from Dr. Alba De Simone and Dr. Kishanlal Chakrabarti stated that Bard had become disabled in December of 2001. At the time Bard submitted this letter, it appears that he understood the Plan to require him to demonstrate that he was disabled, but not that he was disabled while still employed. There is no evidence that, as of this point in time, the Board had yet informed Bard of the reasons for its initial rejection of his application, as it was required to do.

The trustees again considered Bard's case at a January 30, 2004 meeting. This time they debated the substantive question of whether Bard's application should be approved. They deadlocked. They asked that the Plan's attorney be present at the next meeting to advise them.

After the January 30th meeting, but before the next Board meeting, it appears that Bard had additional medical information faxed to the Board: a medical report from a counselor at Lawless & Company (a counseling service provider). This report stated that

-8-

Bard had received treatment for substance abuse in March of 2000. The report also stated that as of that month, which was more than a year before Bard's crane accident, Bard had shown symptoms consistent with various psychological disorders, though the counselor had declined to make a final diagnosis.

The Board, at its February 25, 2004 meeting, continued considering the substantive question of whether or not Bard should receive disability benefits. The trustees, following their interpretation of the McLaughlin arbitration, questioned whether Bard had been totally and permanently disabled prior to his termination. The trustees weighed the fact that Drs. De Simone and Chakrabarti had placed December 2001 as the date on which Bard became totally disabled. The Board also considered whether Bard could have been totally and permanently disabled prior to termination if he had been working right up until the day he was fired. A vote was taken and the trustees again deadlocked, seven to seven. There is no evidence that the Board took any further action on Bard's application for approximately the next four months, despite applicable regulatory time limits. See id. § 2560.503-1(i)(3)(ii).

Bard retained counsel, and on June 28, 2004, his attorney sent BSA-ILA a letter requesting all documents relevant to Bard's application. Meeting minutes from the three Board meetings discussing Bard apparently were sent in response to this request,

-9-

along with other documents. It was only at this point, or through verbal representations made to Bard some time after the January or February 2004 meetings, that Bard learned of the Plan's apparent requirement that he have become totally and permanently disabled while still employed.

D.      The August 2004 Submissions

On August 16, 2004, Bard's attorney sent the Plan a letter requesting that Bard's application be considered at the next Board meeting. Bard also submitted additional evidence, including medical evidence that Bard had become totally and permanently disabled prior to the July 23, 2001 termination of his employment. Specifically, Bard included a letter from Dr. Elliott Segal stating that Dr. Segal had treated Bard between October 2, 2001, and March 4, 2002, and that in Dr. Segal's opinion Bard had become totally and permanently disabled prior to termination of his employment. Bard also included a revised letter from Drs. De Simone and Chakrabarti, dated June 23, 2004, in which they now said Bard had been disabled at least since March 21, 2000. Additionally, Bard submitted the Social Security Administration's determination that he had become disabled as of the day before he was terminated from employment.[5] Finally, Bard submitted his own affidavit stating, inter alia, that due to his mental health condition he believed

_____

[5] It is not clear from the record whether Bard submitted only the Social Security Agency's ultimate determination, or whether he also submitted the full text of the ALJ's report.

-10-

that he had been unable to work "in any gainful way" since 2000, notwithstanding the fact that he had been employed.

The trustees again considered Bard's application at their August 25, 2004 meeting. At the January and February meetings, the trustees had apparently considered the substantive question of Bard's eligibility for benefits. At this meeting, however, the trustees appear to have reverted back to considering the procedural question of whether Bard was even eligible to apply for disability benefits; on that issue the management and union trustees deadlocked, seven to seven. The Board decided to submit the issue to arbitration.

E.      Suit, Arbitration, and Ultimate Denial

Frustrated with the delay, Bard filed suit on September 7, 2004, in federal district court in Massachusetts seeking benefits under the Plan.

While that suit was pending, on December 20, 2004, a hearing was held before an arbitrator on the issue of Bard's eligibility to apply for benefits. One of the management trustees' key arguments was that because Bard had been working as a crane operator up until his termination date, Bard clearly had not been totally and permanently disabled prior to termination. Thus these trustees saw no need to allow Bard even to apply for benefits.

In a written decision dated March 4, 2005, the arbitrator rejected the management trustees' position. He decided that Bard

-11-

was eligible to apply for benefits because he was now alleging that his total disability occurred prior to his termination. The arbitrator also explained that the issue of whether Bard's application should be approved on the merits was not an issue presented to him for review. The management trustees' argument went to the merits of Bard's claim, not to the procedural question of Bard's eligibility to apply.

By now it was at least 17 months after Bard first applied for benefits from the Plan. The Board, accepting the arbitrator's decision that Bard was eligible to apply, then considered the merits of Bard's application at its meeting on March 23, 2005. By a vote of ten to four, the trustees rejected the application. The meeting minutes do not state the Board's reasons for its decision. On April 28, 2005, the Board sent Bard a letter communicating the denial of benefits. The sole reason for decision stated in the letter was that "Pursuant to Article VIII (Disability Benefits)" of the Plan, the Board "in its sole judgement" had determined that Bard "was not totally and permanently disabled prior to his termination." No explanation was provided in the letter as to the reasons for the Board's determination. The letter also stated that Bard had the right to "appeal" the decision to the Board.

Both parties then moved for summary judgment in the federal court action. In a decision issued on March 16, 2006, the district court granted BSA-ILA's motion and denied Bard's. The

-12-

court first reasoned that the Plan was entitled to the deferential
arbitrary and capricious standard of review because plan provisions
gave the Board discretionary authority to interpret the Plan's
terms and to make disability determinations. Under that standard,
the district court found that the Plan could reasonably have
determined, based on the evidence before it, that Bard was not
totally and permanently disabled prior to termination of his
employment. Additionally, the district court rejected Bard's
argument that the Plan's terms did not actually require a claimant
to have been disabled prior to termination.[5]

## II.

We review the district court's grant of summary judgment
de novo. Orndorf v. Paul Revere Life Ins. Co., 404 F.3d 510, 516
(1st Cir. 2005). In the ERISA context, summary judgment is merely
a vehicle for deciding the case; the factual determination of
eligibility for benefits is decided solely on the administrative
record, and "the non-moving party is not entitled to the usual
inferences in its favor." Id. at 517.

While our review of the district court's decision is de
novo, our standard of review for the Board's decision is a

---

[5] The district court also denied Bard's request, made in light
of the Plan's delays, that the administrative record be limited to
only those documents in the record at the time Bard's lawsuit was
filed. The court noted that "there is no evidence of material
noncompliance by the Board" and that "in any event, the
administrative record proposed by plaintiff does not support his
position."

-13-

different issue entirely. The parties dispute whether the Board's
determination should be reviewed under a de novo standard or under
the deferential arbitrary and capricious standard.

Generally, our review of a benefits determination will be
highly deferential when a plan's terms clearly grant its decision
makers the discretionary authority to interpret the plan and
determine eligibility for benefits. See Terry v. Bayer Corp., 145
F.3d 28, 37, 40 (1st Cir. 1998) (applying deferential review to
both plan interpretation and eligibility determinations). The BSA-
ILA plan has both a grant of discretion to interpret the Plan and
a grant of discretion to determine disability.

Nevertheless, when Bard had first filed this lawsuit, the
Plan had not yet resolved his benefits claim despite a significant
passage of time. Faced with no decision from the Board, Bard
brought suit on a "deemed exhausted" basis,[6] similar to what was
known as a "deemed denied" basis under the old ERISA regulations.[7]

_____

[6] BSA-ILA has expressly waived any claim that Bard failed to
exhaust his administrative remedies prior to filing suit.

[7] In 2000, the ERISA regulations were revised, and the
language about claims being "deemed denied" was deleted. Compare
29 C.F.R. § 2560.503-1(e)(2), (h)(4) (2000) (providing that if an
ERISA plan does not make a decision within ERISA's time limits "the
claim shall be deemed denied"), with 29 C.F.R. § 2560.503-1(l)
(2006) (providing that if a plan fails to follow ERISA's procedural
requirements, including its time limits, "a claimant shall be
deemed to have exhausted the administrative remedies available
under the plan and shall be entitled to pursue any available
remedies under section 502(a) of [ERISA] on the basis that the plan
has failed to provide a reasonable claims procedure that would
yield a decision on the merits of the claim"). Bard's claim, filed

-14-

See Mass. Mut. Life Ins. Co. v. Russell, 473 U.S. 134, 144 (1985)
(discussing "deemed denied" claims).  Cases from other circuits,
all governed by the old ERISA regulations, have held that a de novo
standard of review may be proper in deemed denial cases -- though
some of these cases have also examined whether there has been
"substantial compliance" with ERISA and/or the plan's terms.[8]

Our consistent approach in ERISA cases has been to eschew
automatic rules and to evaluate each case on its own.  See, e.g.,
Buffonge v. Prudential Ins. Co. of Am., 426 F.3d 20, 31 (1st Cir.
2005) (taking a case-by-case approach to determining the proper
ERISA remedy); Glista v. Unum Life Ins. Co. of Am., 378 F.3d 113,
130-31 (1st Cir. 2004) (taking a case-by-case approach to
addressing a plan's attempt to articulate in litigation a new basis
for the denial of benefits).

Here, it is easy to understand why a multi-employer
pension plan, whose trustees are equally divided between labor and

_____

after January 1, 2002, is governed by the new regulations.  See 29
C.F.R. § 2560.503-1(o)(1).

[8] See, e.g., Nichols v. Prudential Ins. Co. of Am., 406 F.3d
98, 109 (2d Cir. 2005); Jebian v. Hewlett-Packard Co. Employee
Benefits Org. Income Prot. Plan, 349 F.3d 1098, 1105-08 (9th Cir.
2003); Gilbertson v. Allied Signal, Inc., 328 F.3d 625, 631 (10th
Cir. 2003); Gritzer v. CBS, Inc., 275 F.3d 291, 295-96 (3d Cir.
2002); cf. McGarrah v. Hartford Life Ins. Co., 234 F.3d 1026, 1031
(8th Cir. 2000) (examining whether procedural irregularities raise
a serious question that the plan's decision was arbitrary and
unconsidered).  But see S. Farm Bureau Life Ins. Co. v. Moore, 993
F.2d 98, 101 (5th Cir. 1993) (applying deferential review to deemed
denied claims).

-15-

management, would not be as efficient as a single decision-maker. At the same time, it is not clear that the ERISA regulatory structure intends to give multi-employer plans the kind of slack that the Plan appropriated for itself in this case. Cf. 29 C.F.R. § 2560.503-1(i)(3)(ii) (outlining special time limits, applicable only to multi-employer plans, for a plan to decide a disability benefits appeal and notify the claimant).

Ultimately, we do not decide whether the Plan's failure to render a timely decision by itself entitles Bard to de novo review, whether the Plan's eventual benefits denial after suit was filed was in "substantial compliance" with ERISA's time limits and other regulations, or whether inquiry into "substantial compliance" is even relevant in ERISA cases of this nature -- whether brought under the new regulations or otherwise. Those are complicated questions on which the circuits have divided. See Nichols v. Prudential Ins. Co. of Am., 406 F.3d 98, 106-10 (2d Cir. 2005) (discussing the different positions taken). Instead, in keeping with our case-by-case approach, we tailor our resolution of the issues to the unique facts presented.

### III.

This case reveals substantial confusion on the Plan's part about the basic eligibility requirements for applying for benefits, the substantive standard for awarding benefits, and the procedures for taking an administrative appeal from the denial of

-16-

benefits.  We evaluate the Plan's procedural missteps in light of
ERISA's requirement that plans provide clear notice to potential
claimants of their substantive and procedural rights.

The need for clear notice pervades the ERISA regulatory
structure.  For example, one of the key purposes of an SPD is to
state in normal everyday language both what the eligibility
requirements are, and what procedures the claimant must follow.
See 29 U.S.C. § 1022(a).  Similarly, when a plan denies benefits,
it is required to provide a notification that sets forth "specific
reasons for such a denial, written in a manner calculated to be
understood by the participant."  Id. § 1133; see also 29 C.F.R.
§ 2560.503-1(g)(1) (requiring that the notification of a denial of
benefits provide its explanation "in a manner calculated to be
understood by the claimant").  The Plan's documents themselves
require that in the event of a benefits denial, BSA-ILA must
provide the claimant with notice that sets forth "[t]he specific
reason or reasons for the denial" and makes "[s]pecific reference
to the pertinent Plan provisions on which the denial is based."

We focus on two pertinent points in evaluating the lack
of clarity and notice to Bard: Bard's reliance on a reasonable
interpretation of the Plan, and the ultimate effect of the lack of
clarity and notice.

The first point is that the Board's ultimate
interpretation of the Plan -- that a claimant must be permanently

-17-

and totally disabled before the termination of employment -- is not at all self-evident from the Plan's language. Bard's contrary reading is reasonable, and it was not unreasonable for Bard, in the absence of clarification from the SPD, to rely on that reading in submitting his initial supporting medical documentation. Of course, the fact that a plan provision is capable of different readings would not alone negate deference to the Plan.

The second point rests on the first. The Board's handling of the Plan's ambiguity, and its failure to comply with ERISA's requirements, caused substantive prejudice to Bard's application going well beyond the costs of delay. In the particular circumstances of this case, Bard was faced with a constant shift in what he was required to show. And then BSA-ILA made matters worse by failing to consider the evidence he submitted in an attempt to meet a moving target.

As a result of the Plan's ambiguity, the Board's procedural failures, and the subsequent prejudice to Bard, and for the reasons that follow, we find that Bard is entitled to a remedy. The result is limited to this case. We do not reach hypothetical questions about future applicants under this Plan who are accurately and adequately notified of BSA-ILA's interpretation. Instead, we state our holding as follows: when a plan with material ambiguous terms violates ERISA in the manner that BSA-ILA did, and a claimant's application is prejudiced by these violations through

-18-

his reliance on a reasonable interpretation that the plan does not ultimately adopt, we will bar the plan from using the claimant's reliance against him.   We start by explaining why Bard's understanding of the Plan's terms was reasonable.

A.        The Plan's Terms

No BSA-ILA plan provision explicitly requires that a claimant have been totally and permanently disabled prior to termination of his employment.  Such a requirement is not hard to draft.  Cf. Perry v. New England Bus. Serv., Inc., 347 F.3d 343, 344-45 (1st Cir. 2003) (plan explicitly provided that disability benefits were only available if the claimant became disabled before "ceas[ing] to be an Active Full-time Employee").   Rather, the relevant plan provisions merely grant benefits to a "Participant" who has accrued sufficient years of service, and who becomes "totally and permanently disabled."  The Plan's general definitions section defines "Participant" as "an Employee who has met the requirements of eligibility to participate in the Plan."   And "Employee" is in turn defined as "each individual who now, or hereafter is employed as a Longshoreman, Clerk, or Linehandler in the industry and is a member of the ILA and for whom an Employer is required to make contributions" to the Plan.

BSA-ILA argues that its interpretation is obvious from this language.   Its argument is apparently that the word "Employee," as referred to in the definition of "Participant," must

mean either a current employee or someone who was a current employee at the time he became eligible for benefits.

It is fair to say that Bard's contrary reading is also reasonable.[9] He argues that the word "Employee" includes former employees who become totally and permanently disabled after leaving employment.

First, Bard contends that the definition of "Employee," by its plain language, makes no distinction between former and present employees. It merely refers to an individual who "now or hereafter" is employed in certain positions, is a member of the ILA, and is a person for whom contributions are required. Either at the time the Plan was adopted, or at a time afterwards, Bard met these requirements.[10] Indeed, Bard argues that a number of other plan terms clearly refer to the word "Participant" as

--------

[9] Indeed, Bard contends that the Plan's terms on eligibility so clearly and unambiguously support him that this court must adopt his interpretation under any standard of review. Cf. Dandurand v. Unum Life Ins. Co. of Am., 284 F.3d 331, 336-38 (1st Cir. 2002). We do not reach that argument.

[10] At oral argument, BSA-ILA's counsel challenged Bard's textual argument by claiming, for the first time, that "Employee" must refer to "active" employees because the definition of "Employee" refers to individuals for whom benefit contributions are required. Counsel told us that it is only active employees for whom contributions are required. This new argument appears to be premised on the existence of certain terms in a collective bargaining agreement. That agreement is not in the record, nor do we know the extent to which Bard was aware of or had access to these terms in the agreement. In any event, this new argument about the meaning of "Employee" is not grammatically compelled. It instead depends on exactly which terms are modified by the Plan's "now, or hereafter" language.

-20-

including former employees who were not eligible for the payment of benefits at the time of their termination. In particular, the Plan's retirement provisions specifically refer to "terminated Participants," who are eligible to receive their vested pensions upon attaining a particular age.

Also, Bard argues that his interpretation comports with ERISA's definition of the word "participant." Under that definition, a "participant" is "any employee or former employee of an employer . . . who is or may become eligible to receive a benefit of any type from an employee benefit plan." 29 U.S.C. § 1002(7) (emphasis added).

Our response is that ERISA's definitions technically apply only within the ERISA statute, and the Plan can of course adopt its own meanings of various terms. The Plan itself provides for arbitration to decide close questions of interpretation, and Bard has no special interpretive status. We merely conclude that Bard's interpretation, in the absence of clear guidance, was reasonable. The rest of our analysis relies on nothing more.

B.        The Plan's Procedural Failures

Had the Plan uniformly and promptly settled upon an interpretation of the key plan terms, and made that interpretation clear to Bard at all material times, this might have been a different case. But it did not, and how it handled his claim violated ERISA.

The Plan's specific violations of the ERISA regulations
had different characteristics. Of particular importance were its
failure to provide a variety of decisional safeguards in the review
process, and its violations of ERISA's notice requirements.[11]

We start with the failure to abide by the notice
requirements. Under 29 U.S.C. § 1133, every ERISA plan must:

> (1) provide adequate notice in writing to any
> participant or beneficiary whose claim for
> benefits under the plan has been denied,
> setting forth the specific reasons for such
> denial, written in a manner calculated to be
> understood by the participant, and
> (2) afford a reasonable opportunity to any
> participant whose claim for benefits has been
> denied for a full and fair review by the
> appropriate named fiduciary of the decision
> denying the claim.

Under the Department of Labor's regulations, a plan must
provide "written or electronic notification of any adverse benefit
determination." 29 C.F.R. § 2560.503-1(g)(1). This notification
must state "[t]he specific reason or reasons for the adverse
determination," id. § 2560.503-1(g)(1)(i); it must make reference

---

[11] In concluding that the Plan violated a variety of ERISA
requirements, we cite to the standard ERISA regulations in 29
C.F.R. § 2560.503-1. In its brief, the Plan treats these standard
regulations as governing.

It is sometimes permissible for plans under collective
bargaining agreements to depart from the terms of these
regulations. See id. § 2560.503-1(b)(6) (explaining that for
certain plans established pursuant to a collective bargaining
agreement, the standard ERISA regulations will not apply if the
collective bargaining agreement "sets forth or incorporates by
specific reference" certain alternative claims procedures). The
Plan has not argued that it falls under this exception.

"to the specific plan provisions on which the determination is based," id. § 2560.503-1(g)(1)(ii); and it must include information about how the claimant can pursue further review and rectify the deficiencies in his application, see id. § 2560.503-1(g)(1)(iii), (iv).

Additionally, in its notice of denial, a disability benefits plan must provide information about any internal rules, guidelines, or protocols that the plan relied on in making its determination. Specifically, the plan's notification must provide

> either the specific rule, guideline, protocol, or other similar criterion [relied upon]; or a statement that such a rule, guideline, protocol, or other similar criterion was relied upon in making the adverse determination and that a copy of such rule, guideline, protocol, or other criterion will be provided free of charge to the claimant upon request.

Id. § 2560.503-1(g)(1)(v)(A).

All of these notice provisions serve an obvious purpose: they seek to notify the claimant of what he or she will need to do to effectively make out a benefits claim and to take an administrative appeal from a denial. See DiGregorio v. Hartford Comprehensive Employee Benefit Serv. Co., 423 F.3d 6, 14 (1st Cir. 2005); Glista, 378 F.3d at 129; 65 Fed. Reg. 70,246, 70,251 & n.25 (Nov. 21, 2000). In doing so, the aim is also "'to minimize the number of frivolous lawsuits; promote consistent treatment of claims; provide a nonadversarial dispute resolution process; and

-23-

decrease the cost and time of claims settlement.'" Glista, 378
F.3d at 129 (quoting Powell v. AT&T Commc'ns, Inc., 938 F.2d 823,
826 (7th Cir. 1991)).

There is no evidence in the record that the Plan complied
with a single one of these notice provisions after it deemed Bard
ineligible to apply for benefits in October 2003.[12]  There was no
written or electronic notification to Bard at all.   Thus no
document adequately notified Bard of the specific reasons why the
Board initially rejected his claim.  There was also no adequate
notification of the specific plan provisions on which the denial
was based.  Nor was Bard sufficiently informed about how he could
perfect his claim on review.

Additionally, in relying on the McLaughlin arbitration to
reject Bard's claim, the Board relied on a "rule, guideline,
protocol, or other similar criterion."   29 C.F.R. § 2560.503-
1(g)(1)(v)(A).  It is clear that the Board treated the "holding" of
the McLaughlin arbitration as stating a rule governing which
claimants may apply for benefits.  Yet Bard was not notified of
even a condensed version of this rule, nor does it appear that he

---

[12] For purposes of the ERISA regulations, the Board's initial
determination that Bard was ineligible to apply for benefits is an
"adverse benefit determination," notwithstanding the Plan's
argument that the Board did not initially reject Bard's claim on
its merits.  See 29 C.F.R. § 2560.503-1(m)(4) (defining an "adverse
benefit determination" to include any denial of a benefit or
failure to make a payment for a benefit, including one based on the
claimant's "eligibility to participate in a plan").

-24-

was timely notified that the McLaughlin arbitrator's opinion
existed at all.

Also relevant is the Plan's failure to provide a variety
of procedural safeguards designed to ensure the objectivity of its
administrative appellate review.[13]   An appeal must be decided,
without any deference to the prior determination, by an appropriate
plan fiduciary "who is neither the individual who made the
[initial] adverse benefit determination . . . nor the subordinate
of such individual."  Id. § 2560.503-1(h)(3)(ii), (h)(4).  The full
Board both initially rejected Bard's application and heard Bard's
appeal from that denial.  Indeed, when the Board ultimately denied
Bard his benefits on the merits in March 2005, its denial letter
indicated that any further appeal would again be to the Board
itself.  Bard was thus deprived of a fully objective review of his
benefits denial.

This reduced objectivity was further compounded by the
Board's failure to consult an appropriate medical expert in
reviewing Bard's claims.  See id. § 2560.503-1(h)(3)(iii), (h)(4)
(requiring an appellate body to consult an appropriate medical
expert in reviewing a claim of this nature); id. § 2560.503-

---

[13] Contrary to the Plan's attempt to suggest otherwise, the
Board's 2004 and 2005 actions are properly characterized as
considering an "appeal" and not as making an initial "benefits
determination."  This is because the Board's 2003 decision not to
award benefits was an "adverse benefit determination," even if it
was based on a procedural reason and was not a denial on the
merits.  See 29 C.F.R. § 2560.503-1(m)(4).

1(h)(3)(v), (h)(4) (requiring that the Board's medical expert on review be an expert not consulted in the initial benefits determination). No BSA-ILA doctor examined either Bard or his medical records.

C.       Prejudice

Our cases, decided under the previous ERISA regulations, have generally put a burden on the claimant to demonstrate how a plan's ERISA violations prejudiced him by affecting review of his claim.[14] For example, in DiGregorio the court found that where a plan may have failed to provide a claimant with her entire claims file, the claimant was required to show some relevant prejudice in order to get a remand to the plan and a second bite at the apple. See 423 F.3d at 15-16. DiGregorio built on two of our earlier opinions. In Terry, the notice of denial of benefits had arguably failed to meet ERISA's notice requirements, and the court required the plaintiff to show prejudice in order to obtain benefits. See 145 F.3d at 38-39. In Recupero v. New England Telephone & Telegraph Co., this court adopted a requirement of showing prejudice to obtain benefits in an ERISA § 503(1), 29 U.S.C.

_____

[14] A showing of prejudice may not be needed in a case where the plan's own grant of discretionary authority does not extend to the actual decision maker involved. See Rodriguez-Abreu v. Chase Manhattan Bank, N.A., 986 F.2d 580, 583-84 (1st Cir. 1993); see also Firestone Tire & Rubber Co. v. Bruch, 489 U.S. 101, 115 (1989) (holding that de novo review is appropriate unless a plan's terms specifically grant discretion to its administrators). That is not the factual situation here.

§ 1133(1), defective notice case. See 118 F.3d 820, 840 (1st Cir. 1997). DiGregorio rejected the argument that Terry and Recupero were distinguishable because of the differences in procedural violations and the differences in remedies sought. See 423 F.3d at 16. Without addressing whether a prejudice showing is always required under the new ERISA regulations, we find that Bard was prejudiced by the Plan's ERISA failures.[15]

First, the Plan's failure to comply with the ERISA notice provisions significantly prejudiced Bard in his claim for benefits. Because Bard was not initially informed that he needed to show that his total disability occurred prior to termination of his employment, he submitted medical documentation not meant to address that point and which ultimately proved quite harmful to his administrative appeal. Specifically, when Bard submitted medical evidence of his disability in January 2004, he included a letter from Drs. De Simone and Chakrabarti stating that he had become totally disabled in December of 2001 -- approximately five months after he stopped working. At the time of this submission neither

_____

[15] DiGregorio also stated that a district court's finding of no prejudice is a "factual conclusion that we review only for clear error." 423 F.3d at 13. Here the district court did not actually make factual findings about prejudice. Instead, in response to Bard's argument that the Plan's delays should result in a limitation of the administrative record, the court summarily stated that "there is no evidence of material noncompliance by the Board." Since there are no relevant factual determinations to defer to, we make our own determination of prejudice from the administrative record. Further, it was clear error to hold that there was no "material noncompliance by the Board."

-27-

he nor his doctors had been informed that the exact date of his total disability would be relevant. Indeed, under Bard's reasonable reading of the Plan, he needed only to show that he was totally and permanently disabled at the time of his submission. He had little reason then to ask Drs. De Simone and Chakrabarti to be precise about the date he became disabled. And it is unclear whether Drs. De Simone and Chakrabarti in fact engaged in any analysis that specifically tried to identify the exact onset date of Bard's disability.

Once Bard learned of the Plan's interpretation of its disability provisions, he went back to Drs. De Simone and Chakrabarti. They then issued a revised letter dating Bard's disability to before Bard's termination.[16] Additionally, Bard obtained a letter from Dr. Segal, which also dated Bard's disability to before his termination from employment. These letters were submitted to the Board in August 2004 as part of Bard's attempt to restart the then-stalled review process.

Importantly, when the Board later voted to deny benefits, its counsel tells us that it discounted Bard's new medical evidence

---

[16] It is true that this letter did not explain why the doctors were revising their opinion. The Board argues to us that this is a reason to disregard their new letter entirely. The Board failed, however, to give any indication that this was an issue when it sent Bard its April 2005 letter denying his claim on the merits. Bard thus was not informed that the Board considered this omission important. Had he been so informed, he could have gone back to Drs. Chakrabarti and De Simone and asked them to supplement their explanation.

because it was inconsistent with the disability date reflected in Bard's first batch of evidence. Indeed, the Plan's brief to this court recounts that the Board members "elected to discount the Appellant's self-serving and revised medicals -- which were created after the Appellant knew of the issue about when his disability occurred -- and rely on his first set of medicals, which documented no disability until after his termination." The prejudice from the Plan's faulty notice could not be clearer.

        The prejudice to Bard was then compounded by the Board's failure to take the required steps for ensuring objective administrative review. Had a different fiduciary decided Bard's appeal (instead of the same entity that initially rejected Bard's claim), and/or had the Board followed ERISA regulations by consulting an appropriate medical expert, it might not have so readily dismissed Bard's medical evidence.[17]

_____

[17] Indeed, a more objective review could potentially have solved another problem. The Plan's denial of benefits on administrative appeal did not mention at all the Social Security ALJ's determination that Bard had been disabled at the time he was terminated. The Plan's brief posits that there was no need to mention this because the Plan's definition of disability differs from the one used by the ALJ (although the brief does not describe how). It is true that a plan is not required to accept a Social Security adjudication of disability as binding on it where the definitions of disability are different. See Pari-Fasano v. ITT Hartford Life & Accident Ins. Co., 230 F.3d 415, 419-20 (1st Cir. 2000). Nor is a plan required to defer to treating physicians in the manner required of an ALJ in a Social Security case. See Black & Decker Disability Plan v. Nord, 538 U.S. 822, 825 (2003). But that does not mean that the Social Security determination provides no relevant evidence. See Pari-Fasano, 230 F.3d at 420. If the Board did in fact discount this evidence because of a differing

-29-

The Plan contends that because Bard was working as of his termination date, it is inherently unreasonable to conclude he was totally and permanently disabled at that time. It implies that, as a result, Bard suffered no prejudice from the Plan's violations. We reject the argument on the facts here. The Plan essentially asks this court to adopt a legal rule that it is fundamentally inconsistent for an ERISA claimant to be at work and also be sufficiently disabled to support a total and permanent disability claim. That is not self-evidently true. Instead, the matter appears to depend on the nature of the disability.[18]  As the McLaughlin arbitrator recognized, permanent and total disability may develop while someone is working. This certainly applies, inter alia, in cases of mental disabilities. See Radford Trust v. First Unum Life Ins. Co. of Am., 321 F. Supp. 2d 226, 246-47 (D. Mass. 2004). In fact, Bard's doctors obviously disagree with the

definition of disability, or a differing level of deference to treating physicians, the trustees could easily have stated this to Bard in their letter communicating the benefits denial. Their failure to do so suggests that the evidence was not considered at all.

[18] Additionally, adoption of BSA-ILA's "common sense" rule could lead to some pernicious effects. Employers who think an employee may be becoming disabled will have an incentive to terminate satisfactory employees, before they reach the point of unambiguous disability, in order to avoid the payment of disability benefits.

Board's view, and they present the only competent medical evidence in the record on the issue.[19]

We do not have the benefit of any medical evidence showing that a given disabling psychological condition is inconsistent with the ability to show up at work. Thus a decision

_____

[19] The Board's position is not strengthened by our decision in Sullivan v. Neiman Marcus Group, Inc., 358 F.3d 110 (1st Cir. 2004). BSA-ILA contends that Sullivan, a case about the Americans with Disabilities Act (ADA), memorializes "the commonsense notion . . . that if an employee is performing his job satisfactorily then he obviously is not totally and permanently disabled from that job." This reading of Sullivan is well out of context.

In Sullivan we rejected the ADA claim of an alcoholic plaintiff. The plaintiff maintained that his alcoholism constituted a disability because it significantly impaired his ability to work. See 42 U.S.C. § 12102(2)(A) (defining disability as including "a physical or mental impairment that substantially limits one or more of the major life activities of an individual"). With some skepticism, we assumed that the plaintiff was correct in his contention that "working" could be a "major life activity" under this definition. Sullivan, 358 F.3d at 115. However, we noted the Catch-22 that resulted from this: the plaintiff had to show substantial difficulty working in order to count as "disabled," but to get relief he was also statutorily required to demonstrate that he was qualified for the job he claimed he was wrongfully fired from. Id. at 114-17. We ultimately relied on the plaintiff's statements that he was able to perform his job adequately despite his alcoholism, and so we upheld summary judgment for the employer on the ground that the plaintiff was not disabled under the ADA. Id.

Sullivan does not hold that an employee who was working before termination will never be able to show he was disabled under the ADA. See id. at 115-17. And Sullivan is an ADA case, not one governed by ERISA. In any event, Bard's case presents facts and issues that are drastically different from Sullivan's. First, Bard flatly contended to the Board, through his affidavit and his medical evidence, that he was not performing his job satisfactorily at the time he was fired. Indeed, shortly before his termination Bard was involved in a crane accident, which at least suggests his performance may have been lacking. Second, nothing in the Plan presents the same Catch-22 that the Sullivan plaintiff faced.

-31-

maker without medical expertise -- such as this court -- would be
hard-pressed to conclude as the Plan argues. That is exactly why
the ERISA regulations (and the Plan's documents) require that
appropriate medical experts be consulted.[20]

D.        Remedy

The Plan's procedural irregularities here were serious,
had a connection to the substantive decision reached, and call into
question the integrity of the benefits-denial decision itself.  In
light of this, we must determine the appropriate remedy for Bard.

ERISA gives courts the authority:

> (A) to enjoin any act or practice which
> violates any provision of this subchapter or
> the terms of the plan, or (B) to obtain other
> appropriate equitable relief (i) to redress
> such violations or (ii) to enforce any

---

[20] We note that there is yet another way in which Bard was
harmed by the Plan's missteps.  Had Bard been put on notice of the
McLaughlin arbitration, and been informed of its availability, Bard
could have made a substantial argument to the Plan that it was
interpreting its disability provisions too strictly.  As the text
of the McLaughlin arbitration makes clear, the arbitrator in that
case explicitly avowed ruling on a situation in which an employee's
condition causes symptoms while the employee is still working,
those symptoms contribute to the employee's departure from
employment, and the condition then worsens into total and permanent
disability after the employee has left his position. Bard arguably
fits that situation.  His submitted evidence demonstrates that he
was experiencing psychological symptoms as early as 2000.   And
those symptoms may have contributed to the drug and alcohol
dependency that got him fired.  Even if the Plan is correct that
Bard was not totally and permanently disabled prior to his
termination, if Bard could show that his symptoms worsened so that
he is now totally and permanently disabled, he could well be
entitled to benefits under a plan interpretation that is perfectly
consistent with the McLaughlin arbitration.

-32-

provisions of this subchapter or the terms of
the plan.

Glista, 378 F.3d at 131 (quoting 29 U.S.C. § 1132(a)(3)) (internal

quotation marks omitted).  Under ERISA, a court's remedial power

"encompasses an array of possible responses."  Id.  Similarly, our

oversight of ERISA cases must be governed by principles of federal

common law.  See Forcier v. Metro. Life Ins. Co., No. 06-1088, slip

op. at 12 (1st Cir. Nov. 20, 2006) (citing Pilot Life Ins. Co. v.

Dedeaux, 481 U.S. 41, 56 (1987)).

        We have invoked our equitable and common law powers to

prevent a plan from taking actions, even in good faith, which have

the effect of "sandbagging" claimants.[21]  See Glista, 378 F.3d at

131-32.  Other courts have shared our concern.  See Jebian v.

Hewlett-Packard Co. Employee Benefits Org. Income Prot. Plan, 349

F.3d 1098, 1104-05 (9th Cir. 2003); Marolt v. Alliant Techsystems,

Inc., 146 F.3d 617, 620 (8th Cir. 1998); cf. Hancock v. Montgomery

Ward Long Term Disability Trust, 787 F.2d 1302, 1307 (9th Cir.

1986) (noting that a plan's failure to explain its reasons for

decision may constitute an abuse of discretion); cf. also Fed.

Power Comm'n v. Texaco, Inc., 417 U.S. 380, 397 (1974) (refusing to

"accept appellate counsel's post hoc rationalizations for agency

_____

        [21] In using the term "sandbagging" we mean only that from
Bard's perspective, the Plan's ERISA failures set in motion a chain
of events whose effect was to shift the targets that Bard was
aiming for, and then penalize Bard for aiming at the first round of
targets.  We do not mean that the Plan acted in bad faith, and
there is no evidence that it did.

-33-

action [because] an agency's order must be upheld, if at all, on
the same basis articulated in the order by the agency itself"
(quoting Burlington Truck Lines, Inc. v. United States, 371 U.S.
156, 168-69 (1962); SEC v. Chenery Corp., 332 U.S. 194, 196 (1947))
(internal quotation marks omitted)).

In Glista the defendant insurer did not articulate a
particular ground for its benefits denial until it was in federal
court. See 378 F.3d at 128. We found that the failure to
communicate this explanation earlier was a violation of ERISA's
notice regulations,[22] and that as a result the claimant had been
unable to effectively challenge the new reasoning during the
administrative process. See id. at 128-30. Ultimately, we barred
the defendant in Glista from using its new rationale in litigation.
Id. at 131-32.

Bard is in a similar position: because of the Plan's
failures to give proper notice, he did not learn about the Plan's
interpretation until it was too late. By the time the Plan's
interpretation was made clear to him, he was forced to argue his
case to a Board that lacked the requisite objectivity, and that

---

[22] Glista was decided under the previous ERISA regulations.
See id. at 128-29 (citing 29 C.F.R. § 2560.503-1(f), (h)(3)
(2000)). Although the new notice provisions are not identical, the
prior provisions contained many of the same requirements, including
the requirement that the plan articulate its "specific reason" for
the denial, and that it point to the specific "plan provisions on
which the denial is based." See 29 C.F.R. § 2560.503-1(f)(1), (2)
(2000).

-34-

used his earlier submissions against him.   Additionally, as in Glista, the defendant plan has "offered no explanation for why it did not explain earlier" its basis for the initial adverse benefit determination.   See id. at 132.

Accordingly, we grant relief similar to what we ordered in Glista.   Thus we bar the defendant plan from using Bard's earlier medical evidence against him.   In so doing, we essentially undo the prejudice that resulted from Bard's reliance on his initial reasonable interpretation of the Plan.   Cf. Mauser v. Raytheon Co. Pension Plan For Salaried Employees, 239 F.3d 51, 54-55 (1st Cir. 2001) (when a plan's SPD conflicts with the plan's terms, the SPD will control if the claimant demonstrates "significant or reasonable reliance" on it).   Our relief also remedies the possibility that the Plan's decision to rely on Bard's first evidence, rather than his later-submitted evidence, was a product of the Board's lack of objectivity.

This relief results in a conclusion that the Board's denial of benefits was invalid under any standard of review, whether de novo or deferential.   As we have previously noted, the Plan's terms require the Board to judge disability "upon competent medical evidence."   All of the medical evidence in this case was

-35-

either silent on the onset of Bard's total disability, or it placed that onset before Bard's termination from employment.[23]

The one exception is Bard's first letter from Drs. De Simone and Chakrabarti, and the Plan is prohibited from relying on that letter.[24]  Other than that, the Plan offers absolutely no competent medical evidence to contravene Bard's medical evidence. The Plan did not have a doctor provide any medical reason to reject Bard's evidence, nor did the Plan have Bard examined by a medical expert of its own. We have already rejected the Plan's generalized assertion that someone who is working necessarily cannot be totally disabled by a mental disease. And there is no evidence from any Plan medical expert saying that the Plan's assertion is true in Bard's case. Nor is there any medical evidence that Bard's doctors cannot be relied upon because they evaluated Bard after his employment had been terminated. Even now the Plan does not argue,

---

[23] Dr. Segal, who treated Bard in October 2001, placed Bard's date of total disability as occurring prior to Bard's termination. The revised letter from Drs. De Simone and Chakrabarti agreed. And the Social Security ALJ determined that Bard became severely disabled as of July 22, 2001.

[24] The Plan suggests that it could have relied on the Lawless & Company report, dated March 2000, which had declined to make a final diagnosis as to Bard's condition.  That report recounted Bard's statements that he believed himself able to work at that time. This report offers no competent medical evidence supporting the Board's conclusion: it expresses no final medical judgment as to Bard's condition right before he was terminated.

-36-

nor can it, that its interpretation requires that a person be treated for a disability before his employment is terminated.[25]

In other circumstances, it might be an appropriate remedy to remand to a plan administrator for reconsideration. See Buffonge, 426 F.3d at 31-32. But a remand is not appropriate here. Unlike in Buffonge, here the remaining evidence compels the conclusion that Bard is entitled to benefits. Additionally, the delay in this case vastly exceeded the time limits that ERISA imposes. During that delay, the medical evidence shows, Bard has been totally and permanently disabled and unable to work. This favors a resolution of his claim without further delay. Cf. Glista, 378 F.3d at 132 ("Glista's medical condition calls for resolving this controversy quickly.").

IV.

The district court's judgment is reversed. The case is remanded, and the district court is instructed to enter judgment

---

[25] Citing a Seventh Circuit case, the Plan contends that it cannot have acted arbitrarily and capriciously by refusing to consider a post-denial diagnosis. See Blickenstaff v. R.R. Donnelly & Sons, 378 F.3d 669, 680-81 (7th Cir. 2004). But that case presented a drastically different fact pattern. There, two medical experts opined that the plaintiff was not totally disabled and that she might be faking the extent of her injuries. A third expert, proffered after the plaintiff's claim had been initially denied, took a different position. Blickenstaff merely holds that when faced with multiple and conflicting expert opinions, a Plan can act reasonably if it does not credit the expert whose diagnosis only came post-denial. See id. Bard's case presents no similar conflict: as we have restricted the record, there is no medical evidence that contravenes Bard's.

requiring BSA-ILA to pay Bard his disability benefits, including any benefits past due, and any applicable interest.  Costs are awarded to Bard.